1

2

3

4

5

6

7    SUPERIOR COURT OF WASHINGTON
     FOR KING COUNTY

8

9    MISTI LEON, as personal representative of the
     ESTATE OF JULIANA LEON, a deceased               No.
     individual,
10
                    Plaintiff,                        COMPLAINT FOR DAMAGES:
11                                                    WRONGFUL DEATH
           v.
12
     EXXON MOBIL CORPORATION;
13   EXXONMOBIL OIL CORPORATION; BP
     P.L.C.; BP AMERICA INC.; OLYMPIC PIPE
14   LINE COMPANY LLC; CHEVRON
     CORPORATION; CHEVRON U.S.A., INC.;
15   SHELL PLC; SHELL USA, INC.;
     CONOCOPHILLIPS; CONOCOPHILLIPS
16   COMPANY; PHILLIPS 66; and PHILLIPS 66
     COMPANY,
17
                    Defendants.
18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................1

II.    PARTIES ..........................................................................................4

   A.     Plaintiff ....................................................................................4

   B.     Defendants ...............................................................................4

III.   JURISDICTION & VENUE ...............................................................13

IV.    FACTUAL ALLEGATIONS .............................................................15

   A.     The extreme heat in the Pacific Northwest during the 2021 Heat Dome caused the death of Juliana Leon. ..............................................................15

   B.     Climate change, primarily driven by burning fossil fuels, caused the extreme heat that killed Julie. ................................................................18

   C.     For most of Julie's life, Defendants knew that the unabated use of their fossil fuel products was altering the climate, which would result in catastrophic harm to the planet and humanity, and lead to deaths like Julie's. ....................................20

      1.     When Julie was a little girl, Defendants learned that their fossil fuel products were intensifying the greenhouse effect and global warming. ..........................21

      2.     By the time Julie was a teenager and wrote her first book of poems, Defendants knew that a growing scientific consensus linked the continued proliferation of their fossil fuel products could lead to "severe" consequences. ..............................23

      3.     By the time Julie became a mother, Defendants knew through their own research that fossil-fuel driven climate change would have catastrophic effects. ...............24

   D.     While Julie was raising her daughter, Defendants knew that the only way to protect against their products' climate-related risks was to reduce the widespread use of and dependence on fossil fuels. ..............................................30

   E.     Instead of warning the public and consumers about the dangers of their products, Defendants launched a campaign of deception to downplay and discredit the risks of climate change and ensure growing demand for their fossil fuel products. .....................34

      1.     Defendants formed and funded front groups to conceal and misrepresent the dangers of their fossil fuel products. ..................................................36

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE i

2.    Defendants sowed uncertainty about climate science and interfered with efforts to reduce fossil fuel consumption that they knew were necessary to prevent the catastrophic risks of climate change. ...............................................44

3.    Defendants funded seemingly independent scientists to create the false appearance of a scientific divide about the evidence of climate change. ......................50

F.    When Defendants could no longer publicly dispute the existence of climate change, they began deceiving the public and consumers about the severity of climate change, as well as Defendants' role in and commitment to preventing further harm. ........................52

1.    Defendants downplay the severity of climate change to mislead consumers into believing the problem is not urgent. .............................................52

2.    Defendants deceptively promote their performative efforts to purportedly mitigate climate change. .............................................55

G.    Defendants' misconduct delayed climate mitigation and adaptation measures that could have prevented Julie's death. .............................................65

1.    Defendants' deceptive conduct materially interfered with the development of alternative energy technologies that could have replaced or significantly reduced fossil fuel use and dependence decades ago. .............................................65

2.    The public could have started preparing for climate change when Julie was still a teenager had Defendants disclosed the same climate research and data they used to inform their own business decisions. .............................................67

H.    Defendants' wrongful conduct is the proximate cause of Julie's Death.................70

V.    LEGAL CLAIMS .............................................71

COUNT ONE – WRONGFUL DEATH AND SURVIVAL, CH. RCW 4.20...................71

COUNT TWO – WASHINGTON PRODUCT LIABILITY ACT, FAILURE TO WARN, CH. RCW 7.72 .............................................71

COUNT THREE – PUBLIC NUISANCE, CH. RCW 7.48...............................................73

VI.    DAMAGES .............................................76

VII.    PRAYER FOR RELIEF .............................................77

VIII.    REQUEST FOR JURY TRIAL .............................................77

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE ii

1

2

## I.    INTRODUCTION

3       1.1.    Juliana Leon ("Julie") was a poet and captivating storyteller. She had an

4   adventurous spirit and was the heart of her family. Her smile and laughter lit up every room

    she entered.

5       1.2.    Julie died from hyperthermia during the hottest and deadliest heat wave the

6   Pacific Northwest has ever experienced. As a resident of temperate Western Washington, Julie

7   never could have imagined dying in this way. Defendants, which are manufacturers,

8   distributors, and sellers of fossil fuels, knew differently. As early as the 1950s—around the

9   time Julie was born—Defendants knew that their fossil fuel products were already altering the

10  earth's atmosphere. By 1968, Defendants understood that the fossil fuel-dependent economy

11  they were creating and perpetuating would intensify those atmospheric changes, resulting in

    more frequent and destructive weather disasters and foreseeable loss of human life.

12      1.3.    It is no coincidence that Defendants understand the risks of their fossil fuel

13  products, but many ordinary consumers do not. For decades, Defendants have concealed their

14  knowledge of and deceived the public about these risks, hooking consumers on fossil fuels

15  without their understanding or consent to the risk of harm to themselves, others, and the planet.

16  This multi-decade campaign of deception has been wildly successful. Because consumers do

17  not understand the severity and breadth of the risks posed by fossil fuel products, they have

18  participated in an economy dependent on them. And when a tragedy like Julie's death results

19  from the prolific use of fossil fuels, it is easy to dismiss the misfortune as an accident rather

20  than a foreseeable consequence of Defendants' deception. Through affirmative

21  misrepresentations and omissions, Defendants have made trillions of dollars and escaped

    accountability for their actions.

22      1.4.    Defendants have known for all of Julie's life that their affirmative

23  misrepresentations and omissions would claim lives. Julie is a victim of Defendants' conduct.

    Her lifespan is a bridge between cause and effect.

24      1.5.    The day Julie died was the hottest day *ever* recorded in Washington with

25  temperatures in Seattle, where Julie died, peaking around 108°F. It was the third consecutive

26  day above 100°F, and record nighttime temperatures prevented the built environment from

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 1

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

being able to dissipate the heat it had absorbed throughout the day. In effect, Seattle had turned into an oven.

1.6.    With its temperate climate, Seattle's residents and infrastructure could not tolerate the heat. Interstate 5 and other roads buckled, making getting around more difficult. People flooded emergency rooms with heat-related symptoms. Hospitals transformed body bags into life-saving devices by filling them with ice and using them to cool living patients with dangerously high body temperatures.

1.7.    On that day, Julie was overcome by heat while driving through Seattle with her windows rolled down. She managed to safely pull off the highway and onto a residential street before losing consciousness. Roughly two hours later, a good Samaritan discovered her, unresponsive and hot to the touch. First responders administered over a dozen rounds of CPR and other lifesaving measures but could not revive her. Julie's internal temperature was 110°F when she died. The official cause of Julie's death was hyperthermia.

1.8.    The extreme heat that killed Julie was directly linked to fossil fuel-driven alteration of the climate. Indeed, scientists have determined that an event as severe as the Heat Dome would have been "virtually impossible" without anthropogenic warming. Defendants' wrongful conduct, including their affirmative misrepresentations and omissions, transformed what was once impossible into reality.

1.9.    Julie was born in 1956, around the same time Defendants learned that the normal use of their fossil fuel products was causing dangerous changes to the earth's atmosphere that would result in global warming. Defendants invested heavily in scientific research, which positioned them at the forefront of climate science. With the knowledge gained through their research programs, Defendants' scientists warned the companies that the continued burning of fossil fuels would warm the planet and destabilize the climate. These industry scientists further warned that the world must begin transitioning away from fossil fuels as a primary energy source by the late 1980s at the latest to avoid "catastrophic consequences." One internal report concluded that "civilisation could prove a fragile thing" if fossil fuel use was not reduced. These dire projections have proven true with startling accuracy.

1.10.    By the time Julie started writing poetry and was old enough to get her driver's license, Defendants knew that their fossil fuel products were altering the climate, and that these

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 2

1
2
climatic changes were dangerous. Defendants therefore had a duty to mitigate these risks by, among other things, warning consumers about the dangers of their products.

3
4
5
6
7
8
9
10
11
12
13
1.11.   Instead, Defendants leveraged their social capital and expertise in climate science research to mount a vast denial and disinformation campaign. Beginning as early as the 1970s, Defendants conspired to discredit the burgeoning scientific consensus on the existence and cause of climate change, deny their own knowledge of climate change-related threats, create doubt about the consequences of burning fossil fuels, and delay the transition to a lower-carbon future. Individually and through trade associations, including the American Petroleum Institute ("API") and Western States Petroleum Association ("WSPA"), Defendants formed front groups, created an echo chamber of denial, and funded seemingly independent scientists to add fodder to debunked explanations for climate change, thereby fabricating a scientific divide. Defendants publicly downplayed the risks of using their products and the severity of climate change, while relying on the same climate models they publicly criticized to fortify their own assets against the coming changes.

14
15
16
17
18
19
20
1.12.   When Defendants could no longer publicly deny the existence of climate change, they employed new tactics to protect their profits and continue producing, refining, and selling fossil fuels at dangerous levels. Defendants falsely present themselves as leaders in the fight against climate change and publicly celebrate their investments in low-emission technologies and zero-emission energy sources, but those investments amount to decimal dust in comparison to their ongoing investments in traditional fossil fuel production. Defendants' continuous deceptive conduct and sophisticated promotion of fossil fuel products without warning of their dangers sustains and inflates demand for fossil fuels and delays the move to alternative energy markets.

21
22
23
24
25
26
1.13.   Defendants' deceptive conduct has resulted in very real consequences: accelerated alteration of our climate, extreme weather events (such as heat domes), and loss of life. These companies knew that their products, if used as intended, would cause many people to die. Despite this knowledge, Defendants aggressively sought to build demand for their products without ever providing warnings to consumers. Further, Defendants affirmatively misrepresented their products' dangers and the actions needed to mitigate them.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 3

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1.14.   Misti Leon brings this lawsuit on behalf of the Estate to hold Defendants accountable for killing her mother and for inflicting unthinkable pain and suffering.[1]

## II.    PARTIES

### A.    Plaintiff

2.1.    Plaintiff Misti Leon is the daughter and sole surviving child of Decedent Juliana Leon ("Julie") and is the personal representative of the Estate of Juliana Leon ("the Estate"). At the time of her mother's premature death by hyperthermia, Julie was a resident of the State of Washington, Whatcom County. As the personal representative of the Estate, Misti Leon brings this action for the wrongful death damages and for Julie's claims surviving death Misti Leon's claims in this case are on behalf of the Estate and all statutory beneficiaries.

### B.    Defendants

2.2.    Defendants are multinational oil and gas companies that produce, refine, distribute, promote, market, and sell fossil fuels and fossil fuel-based products worldwide, including in Washington. The fossil fuels produced by the defendant companies are individually and collectively responsible for the emission of billions of tons of greenhouse gases ("GHGs"). All Defendants are either registered to do business in Washington or have wholly owned subsidiaries registered to do business in Washington.

### 2.3.   **Exxon Entities: Exxon Mobil Corporation, ExxonMobil Oil Corporation**

a.    Defendant **Exxon Mobil Corporation** is a vertically integrated energy and petrochemical corporation incorporated in New Jersey and headquartered in Spring, Texas. Exxon Mobil Corporation has been registered to do business in Washington since 1972. Exxon Mobil Corporation is the parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining &

---

[1] Plaintiff hereby disclaims injuries arising on federal enclaves and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. Plaintiff seeks no recovery or relief attributable to these injuries.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 4

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation.

b.    Exxon Mobil Corporation also conducts business in Washington through its agents and subsidiaries. This includes, among others, the following Exxon Mobil Corporation subsidiaries that are registered to do business in Washington and have appointed an agent for service of process in Washington: ExxonMobil Oil Corporation (registered in Washington in 1959) and ExxonMobil Pipeline Company (registered in Washington in 1946).

c.    Exxon Mobil Corporation controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels.

d.    Defendant **ExxonMobil Oil Corporation** is a New York corporation headquartered in Spring, Texas, and has been registered to do business in Washington since 1959. ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation that acts on Exxon Mobil Corporation's behalf and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Mobil Oil Corporation.

e.    From the mid-1950s to 1988, Mobil Corporation, Exxon's predecessor in interest, operated a refinery in Ferndale, Washington, and until 2022, Exxon Mobil Corporation held a 40% ownership stake in the Yellowstone pipeline. There are dozens of Exxon- and Mobil-branded gasoline service stations throughout Washington, and Exxon has targeted advertisements to Washington consumers.

f.    Exxon's predecessor companies have been involved in American Petroleum Institute (API) leadership since the group's founding, and Exxon has remained heavily involved in API's leadership in recent years. For example, Exxon's CEO is currently on API's Executive Committee and Exxon CEOs have served on API's Executive Committee in 1991, 1996-1997, 2001, and 2005- 2016. Exxon Mobil Corporation's President and CEO Darrent Woods was API Board President from 2018-2020. Exxon Mobil Corporation's predecessor company, Humble Oil and Refining Company, was a member of Western States Petroleum Association (WSPA) since at least the 1950s, and Exxon Mobil Corporation remains

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 5

a WSPA member today. Exxon officials have served on WSPA's Board of Directors in recent years, including from 2009-2016 and in 2020.

        g.      Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "**Exxon**."

    2.4.   **<ins>BP Entities: BP p.l.c., BP America Inc., Olympic Pipeline Company LLC</ins>**

        a.      Defendant **BP p.l.c.** is a vertically integrated energy and petrochemical public limited company registered in England and Wales with its principal place of business in London, England. BP p.l.c. is the ultimate parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company; British Petroleum Company p.l.c.; BP Amoco p.l.c.; Amoco Corporation; and Atlantic Richfield Company.

        b.      BP p.l.c. does business in Washington, including through its numerous subsidiaries, which are registered to do business in Washington and have appointed an agent for service of process in Washington. This includes *inter alia* BP America Inc.; BP America Production Company (registered in Washington in 1963); BP Corporation of North America, Inc. (registered in Washington in 2012); BP Oil Pipeline Company (registered in Washington in 2000); BP Pipelines (North America) Inc. (registered in Washington in 2002); BP Products North America Inc. (registered in Washington in 1959); IGI Resources, Inc. (registered in Washington in 2000); and Atlantic Richfield Company (registered in Washington in 1985).

        c.      BP p.l.c. controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels. BP has owned and operated the Cherry Point Refinery in Whatcom County, the largest oil refinery in Washington State, since it opened in 1971. BP also owned and operated the Ferndale Refinery from 1988-1993. There are more than 140 ARCO-licensed and -branded gas stations throughout Washington, and BP and its subsidiaries have directed and continue to direct advertisements toward Washington consumers.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 6

d.       Defendant **BP America Inc.** is a vertically integrated energy and petrochemical company incorporated in Delaware and headquartered in Houston, Texas. BP America is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. has been registered to do business in Washington since 2000. BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Amoco Corporation; Amoco Oil Company; Amoco Production Company; ARCO Products Company; Atlantic Richfield Washington Corporation; Atlantic Richfield Company (a Delaware Corporation); BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Amoco Plc, BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, Arco Chemical Company.

e.       Defendant **Olympic Pipe Line Company LLC** is a Delaware limited liability company headquartered in Renton, Washington. Olympic Pipe Line Company LLC is a joint venture between TransMontaigne Partners LLC and ARCO Midcon LLC, a wholly owned indirect subsidiary of BP p.l.c. BP is responsible for managing Olympic Pipe Line Company's day-to-day operations, and Olympic Pipe Line Company is subject to BP's management and control. Olympic Pipe Line Company LLC was formerly known as, did or does business ask, and/or is the successor in liability to Olympic Pipeline Co. and Olympic Pipe Line Co.

f.       Olympic Pipe Line Company LLC owns the Olympic Pipeline, a 400-mile pipeline between Blaine, Washington, and Portland, Oregon, and the Bayview, Washington, terminal. BP operates the Olympic Pipeline and Bayview Terminal through its subsidiary, BP Pipelines (North America) Inc., which is a wholly owned subsidiary of BP p.l.c. and is subject to BP p.l.c.'s control. BP Pipelines (North America) Inc. controls operations for BP-operated pipelines from control centers in Tulsa, Oklahoma, and Renton, Washington.

g.       BP's predecessor companies, including Standard Oil Company of Indiana, have been involved in API leadership since at least the 1920s and BP remains an API member today. BP has frequently served on API's Executive Committee, including from 2019-2023, and BP's CEO served as API's Board Chairman in 1988, 1989, and 1998. BP's predecessor companies, including Atlantic Richfield, were members of WSPA since at least

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 7

the 1950s and BP was a member of WSPA until 2020. BP's subsidiary Olympic Pipeline Company was also a member of WSPA from at least 1999 to 2012. BP officials have been on WSPA's Board of Directors in recent years, including from 2008-2016.

h.      Defendants BP p.l.c., BP America, Inc., and Olympic Pipe Line Company LLC, together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "**BP**."

2.5.   **Chevron Entities: Chevron Corporation, Chevron U.S.A., Inc.**

a.      Defendant **Chevron Corporation** is a vertically integrated energy and chemicals company incorporated in Delaware corporation headquartered in San Ramon, California. Chevron Corporation is the parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide. Chevron Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of California (also known as "Socal"); Texaco Inc.; and ChevronTexaco Corporation.

b.      Chevron does business in Washington, including through its subsidiaries and agents, which are registered to do business in Washington and have appointed an agent for service of process in Washington. These subsidiaries include Chevron Pipe Line Company (registered in Washington in 1970); Chevron Oronite Company LLC (registered in Washington in 2000); and Chevron U.S.A., Inc. (registered in Washington in 1965). Chevron's predecessor company, Texaco Inc., built the Puget Sound Refinery near Anacortes in 1957. Texaco owned and operated the refinery from 1958 to 1998 and continued to own and operate it jointly with Shell until 2001. Chevron owns and operates a number of gas service stations in Washington in addition to the hundreds of Chevron-branded gas stations located throughout the state. There are also dozens of Texaco-branded gas stations throughout the state. Further, Chevron and its subsidiaries have directed and continue to direct advertisements toward Washington consumers.

c.      Chevron Corporation controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing of its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

d.      Defendant **Chevron U.S.A., Inc.** is a Pennsylvania corporation headquartered in San Ramon, California, that has been registered to do business in Washington since 1965. Chevron U.S.A., Inc. is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Gulf Oil Corporation; Gulf Oil Corporation of Pennsylvania; Chevron Products Company; Chevron Chemical Company; and Chevron Chemical Company LLC.

e.      Chevron's predecessor in interest, Union Oil Company of California was involved in API leadership beginning in the 1920s and Chevron remains involved in API leadership today. For example, Chevron's CEO served as API Chairman in 1994, 1995, 2003, 2011-2012, and 2022-2024.  Union Oil was also involved in WSPA since at least the 1940s, and Mike Vomund, a Vice President at Chevron, is currently chair of the WSPA Board of Directors. Chevron officials have served as WSPA directors in 2005 and from 2009-2016.

f.      Defendants Chevron Corporation and Chevron U.S.A., Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "**Chevron**."

2.6.    **Shell Entities: Shell plc, Shell USA, Inc.**

a.      Defendant **Shell plc** (formerly Royal Dutch Shell PLC) is a vertically integrated energy and petrochemical company incorporated in England and Wales and headquartered in London, England. Shell plc is the parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of the fossil fuel industry including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

b.      Shell plc controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels. Shell owned and operated the Shell Anacortes Refinery in Whatcom County from 1955 to 1998 and the Puget Sound Refinery in Skagit County from 1998 to 2021. Shell operates hundreds of gasoline

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 9

**Bechtold Law Firm, PLLC**
PO BOX 7051, MISSOULA, MT 59807
(406) 721-1435

service stations throughout Washington. Shell and its subsidiaries have directed advertisements at Washington consumers.

    c.    Shell conducts business in Washington through its subsidiaries and agents, including Shell USA, Inc. and Shell Oil Products Company, both of which are registered to do business in Washington and have appointed an agent for service of process in Washington.

    d.    Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a Delaware corporation headquartered in Houston, Texas, that has been registered to do business in Washington since 1949. Shell Oil Company is a wholly owned subsidiary of Shell Petroleum Inc., whose ultimate corporate parent is Shell plc that acts on Shell plc's behalf and is subject to Shell plc's control. Shell USA, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Shell Oil Company; Deer Park Refining LP; Shell Oil; Shell Oil Products US; Shell Chemical LP; Shell Trading US; Shell Trading (US) Company; Shell Energy Services Company, L.L.C.; Shell Energy Resources Company; The Pennzoil Company; Shell Oil Products Company LLC; Shell Oil Products Company; Star Enterprise, LLC; and Pennzoil-Quaker State Company.

    e.    Shell and its predecessor companies have collaborated with API since the 1920s and have been members of API for decades. Shell's President served on API's Executive Committee from 2005 to 2006 and Shell officials have served on API's Executive Committee over the majority of the last twenty years. Shell has been a member of WSPA since at least 1954 and its officials have continued to serve on WSPA's Board of Directors in recent years, including from 2007-2016 and from 2021-2023.

    f.    Defendants Shell plc, Shell USA, Inc., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "**Shell**."

    2.7.    **ConocoPhillips Entities: ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company**

    a.    Defendant **ConocoPhillips** is incorporated in Delaware and has its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that execute ConocoPhillips's fundamental decisions related to all

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 10

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b.      ConocoPhillips controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels. ConocoPhillips has subsumed the operations of the entire ConocoPhillips group of subsidiaries under its name. ConocoPhillips has developed and purportedly implements a corporate Climate Change Action Plan to govern climate change decision making across all entities in the ConocoPhillips group.

c.      ConocoPhillips does business in Washington through its subsidiaries and agents, which are registered to do business in Washington and have appointed an agent for service of process in Washington. This includes *inter alia* the following ConocoPhillips subsidiaries: ConocoPhillips Company (registered in Washington in 1947); Phillips 66 Company (registered in Washington in 2012); ConocoPhillips Alaska, Inc. (registered in Washington in 1980); ConocoPhillips Communications, Inc. (registered in Washington in 1964); and Polar Tankers, Inc. (registered in Washington in 1980).

d.      Defendant **ConocoPhillips Company** is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips's behalf and is subject to ConocoPhillips's control. ConocoPhillips Company is incorporated in Delaware and has its principal office in Houston, Texas. ConocoPhillips Company has been registered to do business in Washington since 1947. ConocoPhillips Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company; Phillips 66 Company; Tosco Corporation; and Phillips Oil Company.

e.      Defendant **Phillips 66** is incorporated in Delaware and has its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

f.      Defendant **Phillips 66 Company** is a wholly owned subsidiary of Phillips 66 that acts on Phillip 66's behalf and is subject to Phillip 66's control. Phillips 66

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 11

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company has been registered to do business in Washington since 2012. Phillips 66 Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company; Phillips Chemical Company; Conoco, Inc.; Tosco Corporation; and Tosco Refining Co.

g.    Phillips 66 Company's predecessor company Tosco Corporation owned and operated the Ferndale Refinery in Whatcom County beginning in 1993 and Phillips 66 Company continues to own and operate the refinery today. ConocoPhillips and its subsidiaries operate hundreds of gasoline service stations throughout Washington. ConocoPhillips, Phillips 66 Company, and other ConocoPhillips entities have targeted and continue to target advertisements at Washington residents.

h.    ConocoPhillips and its predecessor companies have been members of API since the 1920s. ConocoPhillips executives remain actively involved in API leadership, including Phillips 66 Chairman and CEO serving as API Board President from 2020-2022 and ConocoPhillips Chairman and CEO serving as API Board President from 2016 to 2018. ConocoPhillips's predecessor companies were WSPA members since at least the 1950s and ConocoPhillips executives have remained heavily involved in WSPA leadership – serving on WSPA's Board of Directors from 2004-2005, 2008-2012, 2015-2016, and 2020-2023.

2.8.    When this Complaint references an act or omission of Defendants, unless specifically attributed or otherwise stated, such references mean that the officers, directors, agents, employees, or representatives of Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

a.    Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are referred to herein as "**ConocoPhillips**."

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 12

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1
2

### III.    JURISDICTION & VENUE

3
4

3.1.    This Court has subject matter jurisdiction as Julie's death occurred in King County, Washington, and therefore the cause of action arose in this County.

5
6

3.2.    This court has personal jurisdiction over Defendants because this complaint arises out of business transacted in Washington and tortious conduct directed at Washington residents, including Julie.

7
8
9
10
11
12
13
14
15

3.3.    Each Defendant is transacting or has transacted substantial business in Washington; is contracting or has contracted to supply services or things in Washington; has or does derive substantial revenue in Washington or engages in a persistent course of conduct in Washington; had or has interests in, used or uses, or possessed or possesses real property in Washington; and/or caused tortious injury in Washington and has intentionally engaged in conduct aimed at Washington, which has caused harm they knew was likely to be incurred in Washington, including in King County. Each Defendant has sufficient contacts with Washington to give rise to the current action, has continuous and systemic contacts with Washington, and/or has consented either explicitly or implicitly to the jurisdiction of this Court.

16
17
18
19
20
21

3.4.    A significant amount of Defendants' fossil fuels are or have been transported, refined, distributed, promoted, marketed, sold, and/or consumed in Washington, including in King County, from which Defendants derive and have derived substantial revenue. Defendants—directly and through their subsidiaries and/or predecessors-in-interest—supplied substantial quantities of fossil fuels to Washington State during the period relevant to this litigation. Defendants also market and sell petroleum products (e.g. engine lubricants and motor oils) in Washington, including in King County, through local retailers.

22
23
24
25
26

3.5.    Hundreds of Defendant-branded gas stations serve Washington consumers in the state. Through their various agreements with dealers, franchises, or otherwise, Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuels at their respectively branded gas stations in Washington, including point-of-sale advertising and marketing. Defendants dictate which grades and formulations of their gasoline may be sold at their respectively branded stations.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 13

Defendants also maintain websites to direct Washington residents to their nearby retail service stations.

3.6.    Defendants have purposefully directed and continue to purposefully direct their tortious conduct toward Washington by distributing, marketing, advertising, promoting, and supplying fossil fuels in Washington, with knowledge that fossil fuels have caused and will continue to cause climate change-related injuries in Washington, including in King County.

3.7.    Over the past several decades, Defendants, directly and through their trade associations and industry front groups, have spent millions of dollars on radio, television, outdoor advertisements, and social media sites in the Washington market related to their fossil fuels. For example, a December 12, 2003, op-ed in the Seattle *Post-Intelligencer,* authored by former API and Global Climate Coalition executive William O'Keefe, claimed the "science of climate change" was "far from settled," relying on a "review" by Willie Soon, who was later exposed as receiving more than one million dollars in funding from the oil and gas industry, including some Defendants. In the op-ed, O'Keefe falsely asserts, "Neither I nor anyone else knows whether climate [change] over the course of this century will be a scientific curiosity or a serious ecological threat," when the fossil fuel industry had known for years that climate change posed a "serious ecological threat."

3.8.    From the 1970s and continuing today, Defendants have advertised their products and businesses in print publications circulated widely to Washington consumers, including but not limited to: *The Atlantic*, *The Economist*, *Fortune Magazine*, *The New York Times*, *People*, *Sports Illustrated*, *Time Magazine*, *The Washington Post*, *Newsweek*, and *The Wall Street Journal*.

3.9.    As described below, Defendants have failed to warn and misled consumers about the role of fossil fuels in causing climate change and the resulting harms. Defendants' misconduct was and is intended to increase the use of fossil fuels in and outside Washington and resulted in Julie's premature death.

3.10.    Further, as described below, Defendants knew or should have known—based on information conveyed by their own research programs, trade associations, and industry front groups—that their actions in Washington, including in King County, and elsewhere would

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 14

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

result in global climate change, extreme weather events such as the Heat Dome, and heat-related injuries such as Julie's death.

3.11.    Plaintiff exercised due diligence in the aftermath of her mother's death to determine how and why she died. Plaintiff did not discover, nor should a reasonable person have discovered using due diligence, the existence of her claims as alleged herein prior to three years before filing this action.

3.12.    Defendants' misconduct as alleged herein prevented Plaintiff from discovering that Defendants caused her mother's death. Defendants have deliberately concealed and distorted material facts about the connection between their fossil fuel products and climate change to make it more difficult for reasonable persons to understand that Defendants are responsible for climate disasters like the Heat Dome.

3.13.    Plaintiff filed suit promptly upon discovering the facts essential to her claims, which Defendants knowingly concealed.

3.14.    Venue is proper in King County because Julie's death occurred in King County and Defendants transact business in King County.

## IV.    FACTUAL ALLEGATIONS

**A.    The extreme heat in the Pacific Northwest during the 2021 Heat Dome caused the death of Juliana Leon.**

4.1.    From June 26 to July 2, 2021, the Pacific Northwest experienced an unprecedented heat wave ("Heat Dome") with unseasonable early-summer temperatures hitting triple digits for three consecutive days from June 26 to June 28. King County had previously reached 100-degree temperatures only four times and never three days in a row. The Heat Dome peaked on June 28 with record-breaking temperatures reaching 108°F in Seattle.

4.2.    This heat was deadly, particularly for those who were unable to escape the heat or were otherwise vulnerable to excessive temperatures. Extreme heat is the leading weather-related cause of death in the United States. People living in temperate regions like Western Washington are more vulnerable to extreme heat; they are not acclimated to such high

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

temperatures and often lack access to critical infrastructure, such as air conditioning, to escape the heat.



**Figure 1**: Daily all-cause deaths excluding COVID-19 (top) and daily heat-related deaths (bottom) in Washington state from January 1, 2017 to December 31, 2022, showing the highest number of all-cause deaths occurred on June 28 and June 29, 2021. (Source: Climate Impacts Group, University of Washington)

4.3.    Individual characteristics (e.g. age, body composition, existing medical conditions) can make a person more vulnerable to extreme heat. For example, the body's ability to cool itself declines with age, and body fat acts as insulation, trapping the heat and diminishing the body's ability to release it.  Both expedite an increase in core body temperature, which can result in hyperthermia—a spectrum of heat-related illnesses that includes heat exhaustion and heat stroke.

4.4.    Vulnerable people progress more quickly from heat exhaustion to heat stroke. Symptoms of heat exhaustion include heavy sweating, tiredness, and dizziness. Left untreated, heat exhaustion can turn into heat stroke. Heat stroke occurs when the body reaches a temperature of 103ºF or higher and can no longer cool itself down. Symptoms include confusion, inability to sweat, racing heart, dimming or narrowing vision, and loss of consciousness. When a person's body temperature exceeds 109ºF, the hyperthermia is almost certain to be fatal, as it was for Julie. Increased air temperature, relative humidity, extent of sun-exposure, age, and other individual vulnerabilities to heat all impact the point at which the survivability limits are exceeded.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 16

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

4.5.    Like so many Americans, Julie was among those especially vulnerable to extreme heat.

4.6.    Julie's vulnerabilities did not lessen her zeal for life. At 65 years old, Julie lived independently, drove her own car, and—excited and eager to improve her quality of life—had recently elected to undergo bariatric surgery. Julie's doctors deemed her physically and mentally fit for the procedure, and successfully performed the surgery two weeks prior to her death.

4.7.    On the morning of June 28, Julie drove nearly 100 miles south from her home in Ferndale to Seattle for a post-operative appointment. She had been on a liquid diet since her surgery and was looking forward to being cleared to eat soft foods again.

4.8.    Temperatures were already nearly 90°F when she left her home that morning around 8:00 a.m.

4.9.    At the appointment, Julie's doctor gave her good news and authorized her to reintroduce soft foods. Julie's vitals were taken and found to be unremarkable.

4.10.    By noon when Julie's appointment had ended and she was on her way home, the temperature had climbed to around 102°F. Her car's air conditioning was not working, so she rolled down the windows. In a temperate climate like Seattle, the breeze from the open windows is all that is usually needed to beat the heat on a hot day. But on the hottest day of the Heat Dome, even with the windows rolled down, Julie became overwhelmed by the stifling heat.

4.11.    The onset of Julie's heat-related symptoms occurred so rapidly that she decided it was unsafe to continue driving. While succumbing to heat exhaustion and early stages of heat stroke, Julie used her final moments to ensure that she would not cause harm to anyone else. She safely pulled off the highway and parked her car on a nearby residential street.

4.12.    Julie was so incapacitated by the effects of the heat that she was unable to call for help. She made no outbound calls after parking her car. Nor did she answer any incoming calls, despite having received at least six calls from the time that her appointment ended to when she was found in her vehicle. Her phone was in the seat next to her when she was found.

4.13.    Roughly two hours after Julie parked her car, a passerby found her slumped over and unconscious in the driver's seat. The car was turned off and the windows were rolled

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1  down. The inside of the car was hot to the touch. The bystander called 911 and, upon instruction

2  from the dispatcher, removed Julie from her car and began administering CPR. Emergency

3  medical personnel arrived shortly thereafter and performed several more rounds of CPR and

4  other medical interventions.

5      4.14.    By this time, it was too late—Julie could not be saved. In the minutes leading

6  up to her death, Julie's internal temperature rose from 107 to 110°F. The temperature outside

7  exceeded 105°F.

8      4.15.    Julie's official cause of death was hyperthermia.

9  **B.    Climate change, primarily driven by burning fossil fuels, caused the extreme heat that killed Julie.**

10     4.16.    In Washington, annual average temperatures have increased by almost 2°F

11  since 1900, on par with average global temperature increases. According to the

12  Intergovernmental Panel on Climate Change ("IPCC"), the evidence that burning fossil fuels

13  is primarily responsible for global warming is unequivocal.

14     4.17.    Earth's temperature depends on the balance between energy entering and

15  leaving the planet. When sunlight reaches the planet's surface, it can either be reflected into

16  space or absorbed by the land, oceans, or atmosphere. Absorbed incoming energy warms the

17  planet. Over time, some of the energy absorbed by the land and oceans is released back into

18  the atmosphere as heat (also called infrared radiation). Solar energy that is reflected to space

19  does not warm the planet.

    4.18.    GHGs, including atmospheric carbon dioxide ("$CO_2$"), methane, and water

20  vapor, play a critical role in regulating Earth's temperature. Without these GHGs, the Earth's

21  average temperature would be 0°F. As more GHGs accumulate, more infrared radiation is

22  trapped in the atmosphere causing the Earth to warm, not only because there are more GHG

23  molecules to block infrared radiation from leaving the Earth's atmosphere, but also because a

    warmer atmosphere can hold more water vapor, which then absorbs more radiation.

24     4.19.    In the last 800,000 years, atmospheric $CO_2$ levels rose and fell with natural

25  variability but never exceeded 300 parts per million (ppm), as represented in the graphic below.

26  In just the past 75 years, atmospheric $CO_2$ levels have risen from 300 ppm to 429 ppm.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 18

 

***Figure 2*** Atmospheric $CO_2$ for last 800,000 years (left) and total annual $CO_2$ emissions by source, 1860-2022 (right).

(Sources: NASA & Global Carbon Project)

4.20.    Human combustion of fossil fuels to produce energy creates $CO_2$ and other GHGs as byproducts. Prior to World War II, most anthropogenic $CO_2$ was caused by land-use practices, like forestry and agriculture. Since that time, there has been a dramatic rise in combustion of oil, gas, and coal, and the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously. The modern spike in atmospheric $CO_2$ levels is directly correlated to the increased use of fossil fuels.

4.21.    The increase in GHG accumulation in the atmosphere and the resulting disruption of the Earth's energy balance have environmental consequences, including increased frequency and intensity of heat waves.

4.22.    A heat wave is a period of abnormally high temperatures, typically described as two or more days where the maximum and minimum temperatures are unusually high for that location. Since the 1960s, heat waves in the United States have increased in frequency, duration, and intensity. Seattle now has nearly five more heat waves per year than it did in the 1960s—these heat waves are lasting longer and occurring earlier in the warm weather season. This early occurrence of extreme temperatures is more dangerous because people have not yet had an opportunity to prepare for or acclimate to hotter baseline temperatures.

4.23.    A heat dome is a type of heat wave that has a high-pressure system occurring high in the atmosphere. This causes warm air to be pushed down to the Earth's surface, becoming trapped there for long periods of time.

4.24.    The 2021 Heat Dome in the Pacific Northwest would have been as much as 150 times less likely to have occurred without anthropogenic, fossil fuel-driven climate change. In

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 19

lay terms, this means the event should have been virtually impossible. Scientists have confirmed that the Heat Dome was hotter, lasted longer, and impacted a larger region, and thus was more deadly, because of climate change.

4.25.    Based on more than 130 years of observational data, the Pacific Northwest has never experienced a heat event as severe as the Heat Dome. Tree ring data suggests that no such heat event has occurred in the Pacific Northwest within the last 1,000 years.

4.26.    In the absence of anthropogenic climate change, the Heat Dome would not have reached such extreme temperatures and therefore would have been less lethal. In extreme heat conditions, every additional degree has a marked impact on human health and increases the risk of mortality.

4.27.    Given Julie's individual vulnerabilities, she was particularly susceptible to extreme heat. She died because the temperature increase attributable to fossil-fuel driven climate change made an otherwise hot day so hot that she could not survive her circumstances. Those circumstances would not have been lethal for Julie without such temperature increase.

4.28.    Defendants are responsible for Julie's death. Through their failure to warn, marketing, distribution, extraction, refinement, transport, and sale of fossil fuels, Defendants each bear responsibility for the spike in atmospheric $CO_2$ levels that have resulted in climate change, and thus the occurrence of a virtually impossible weather event and the extreme temperatures of the Heat Dome.

**C.    For most of Julie's life, Defendants knew that the unabated use of their fossil fuel products was altering the climate, which would result in catastrophic harm to the planet and humanity, and lead to deaths like Julie's.**

4.29.    Since at least the early 1950s, Defendants and their trade associations have known that fossil fuel combustion was the primary cause of $CO_2$ build-up in the atmosphere. Between the mid-1950s and late 1960s, Defendants developed an understanding that elevated concentrations of atmospheric $CO_2$ could markedly increase global average temperatures, which would have destructive consequences for human and ecological systems. By the 1970s, Defendants knew that fossil fuel combustion had caused atmospheric $CO_2$ concentrations to increase substantially and that a marked change in the climate, including noticeable increases in temperature, was certain if fossil fuel combustion continued at the current rate.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

1

2

***1.    When Julie was a little girl, Defendants learned that their fossil fuel products were intensifying the greenhouse effect and global warming.***

3

4.30.    In 1954, researchers at the California Institute of Technology ("CalTech")

4

informed API—the fossil fuel industry's main trade association—that fossil fuel combustion

5

had caused atmospheric $CO_2$ levels to increase by 5% since 1840. API provided funding this

6

research but did not share the results publicly.

7

4.31.    That same year, the same CalTech scientists sent a proposal outlining similar

research to the Air Pollution Foundation, in which they warned that "the possible consequences

8

of a changing concentration of the $CO_2$ in the atmosphere with reference to climate . . . may

9

ultimately prove of considerable significance to civilization."[2] The Western States Petroleum

10

Association ("WSPA"; formerly Western Oil and Gas Association)—the fossil fuel industry's

11

oldest lobbying group with members including Defendants—formed the Air Pollution

12

Foundation to be "protective" of the oil industry while appearing "unbiased" amidst public

13

upset about smog.[3]

14

4.32.    Three years later, scientists at Humble Oil (predecessor-in-interest to

ExxonMobil) published an article reiterating that fossil fuel combustion had introduced an

15

"enormous quantity of carbon dioxide" into the atmosphere since the Industrial Revolution.[4]

16

Their conclusion was "in excellent agreement" with that of the API-funded researchers at

17

CalTech.[5]

18

4.33.    In 1959, physicist Edward Teller delivered a speech to an audience of oil and

19

gas industry executives at API's "Energy and Man" symposium. In his speech, Teller explained

20

"why [one should] worry" about carbon dioxide. He warned that if fossil fuel combustion

21

continued to increase at current rates, it would raise atmospheric $CO_2$ levels by 10% by the end

of the century, an amount "sufficient to melt the icecap and submerge New York. All coastal

22

23

[2] Samuel Epstein, *A Proposal to the Southern California Air Pollution Foundation for the Study of Carbon Isotopes in the Atmosphere* 3 (Nov. 15, 1954), https://www.documentcloud.org/documents/24001326-air-pollution-foundation-correspondence-papers-of-samuel-epstein-box-1-folder-5-caltech-archives/.

24

[3] Air Pollution Foundation, *Meeting of Smoke and Fumes Committee, Western Oil and Gas Association* 2 (Apr. 7, 1955), https://www.documentcloud.org/documents/24564204-lee-dubridge-papers-caltech_2/.

25

[4] H. R. Brannon, Jr. et al., *Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels*, 38 Eos Transactions Am. Geophysical Union 643, 643 (1957), https://doi.org/10.1029/TR038i005p00643.

26

[5] *Id.* at 646.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 21

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

cities would be covered, and since a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."[6]

4.34.    In 1962, a Shell geophysicist published a report stating that fossil fuel combustion was "seriously contaminating the earth's atmosphere with $CO_2$," which, he acknowledged, might at that time have already begun changing the climate "in the direction of higher average temperatures." Such changes, he warned, could yield "profound effects both on the weather and on the ecological balances."[7]

4.35.    In November 1965, interest in understanding climate change permeated the public-private divide. President Lyndon B. Johnson's Science Advisory Committee reported that fossil fuel combustion was "measurably increasing the atmospheric carbon dioxide" at a rate that, by 2000, "may be sufficient to produce measurable and perhaps marked changes in climate, and will almost certainly cause significant changes in the temperature and other properties of the stratosphere. . . . The climate changes that may be produced by the increased CO2 content could be deleterious from the point of view of human beings."[8] Wallace Broecker, a geochemist who helped design Exxon's climate change research program in the late 1970s and early 1980s, was a co-author on the report.

CLIMATIC EFFECTS OF POLLUTION

Carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil and natural gas at the rate of 6 billion tons a year. By the year 2000 there will be about 25% more $CO_2$ in our atmosphere than at present. This will modify the heat balance of the atmosphere to such an extent that marked changes in climate, not controllable though local or even national efforts, could occur. Possibilities of bringing about countervailing changes by deliberately modifying other processes that affect climate may then be very important.

*Figure 3* Quote from *Restoring the Quality of Our Environment* later relayed by API President to oil and gas executives.

---

[6] Edward Teller, *Energy Patterns of the Future*, *in* ENERGY AND MAN: A SYMPOSIUM 58 (1960), https://www.documentcloud.org/documents/21094738-1959-energy-and-man-symposium/.

[7] M. King Hubbert, *Energy Resources* 96 (1962), https://nap.nationalacademies.org/catalog/21066/energy-resources.

[8] President's Science Advisory Committee, *Restoring the Quality of Our Environment* 113, 126–27 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 22

4.36.    Several days after the Science Advisory Committee report was released, API President Frank Ikard discussed the findings in an address to oil and gas industry executives, emphasizing the role of burning fossil fuels in creating a modified heat balance that could cause "marked changes in climate" by the year 2000:

> One of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts. The report further states, and I quote: ". . . the pollution from internal combustion engines is so serious, and is growing so fast, than an alternative nonpolluting means of power automobiles, buses, and trucks is likely to become a national necessity." [9]

4.37.    Ikard urged the executives to study the more than 100 recommendations presented in the report.

**2.    By the time Julie was a teenager and wrote her first book of poems, Defendants knew that a growing scientific consensus linked the continued proliferation of their fossil fuel products could lead to "severe" consequences.**

4.38.    API subsequently commissioned research from the Stanford Research Institute, including a 1968 report on carbon dioxide pollution in the atmosphere.[10] The report warned that if $CO_2$ levels continued to rise at present rates, it would "likely" cause "noticeable increase in temperature," and recommended urgent research into technologies and systems "in which $CO_2$ emissions would be brought under control."[11]

4.39.    In a supplemental report commissioned by API roughly one year later, the Stanford Research Institute included a more detailed analysis of the atmospheric buildup of $CO_2$. The report accurately predicted that if fossil fuel consumption trends continued at the current rate, the concentration of $CO_2$ in the atmosphere would reach 370 parts per million ("ppm") by 2000. The report further warned that, while uncertainty remained as to precisely

---

[9] Frank N. Ikard, *Meeting the Challenges of 1966*, *in* PROCEEDINGS OF THE AMERICAN PETROLEUM INSTITUTE 13 (1965), https://www.documentcloud.org/documents/5348130-1965-API-Proceedings/.

[10] *See* E. Robinson & R.C. Robbins, Stanford Res. Inst., *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants* (1968), https://www.documentcloud.org/documents/24223162-1968-stanford-research-institute-sources-abundance-and-fate-of-gaseous-atmospheric-pollutants-prepared-for-american-petroleum-institute/.

[11] *Id.* at 8, 112.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

what "long lived pollutants are doing to the environment," there was "no doubt that the potential damage to our environment could be severe."[12] Actual atmospheric $CO_2$ concentrations reached 369.71 in 2000.

4.40.    API distributed summaries of both the original and supplemental Stanford Research Institute reports to its members, including Defendants, in 1972.

4.41.    In July 1977, Exxon scientist James Black informed the Exxon Corporation Management Committee that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel combustion," and that a doubling of atmospheric carbon dioxide concentrations above pre-Industrial levels would, according to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C over most of the earth."[13]

4.42.    Black also warned: "Present thinking holds that man has a time window of five to ten years [i.e. before 1987] before the need for hard decisions regarding changes in energy strategies might become critical."[14]

4.43.    Despite the growing scientific consensus, public awareness of the threat of climate change and risks associated with the continued proliferation of fossil fuels was nascent.

**3.    By the time Julie became a mother, Defendants knew through their own research that fossil-fuel driven climate change would have catastrophic effects.**

4.44.    It was not long until the fossil fuel industry began to realize that climate change posed an existential threat to their business. On October 15, 1977, Exxon's Henry Shaw and Phillips Petroleum's Leo A. McReynolds attended a government-sponsored workshop in Atlanta, Georgia, and learned that scientific experts had concluded "the climatic effects of carbon dioxide release may be the primary limiting factor on energy production from fossil fuels over the next few centuries."[15] In response, Defendants began producing their own

---

[12] E. Robinson & R.C. Robbins, Stanford Res. Inst., *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement* 11, 25 (1969).
[13] Letter from J.F. Black, Scientific Advisor, Exxon Res. & Eng'g Co., to F.G. Turpin, Vice President, Exxon Res. & Eng'g Co. on The Greenhouse Effect 2, 8 (June 6, 1978), https://www.documentcloud.org/documents/2805568-1978-Exxon-Presentation-on-Greenhouse-Effect/.
[14] *Id.* at 3.
[15] Memo from Henry Shaw to John W. Harrison on Environmental Effects of Carbon Dioxide at 2 (Oct. 31, 1977), https://www.documentcloud.org/documents/2805565-1977-Exxon-Memo-of-Minutes-From-a-DOE-CO2/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 24

research to assess the impacts of anthropogenic greenhouse gases on the climate as well as on their business.

4.45.    Around 1979, Defendants scaled up their climate research programs in earnest. For example:

a.    Exxon launched an in-house research program in March 1979 to study $CO_2$, in collaboration with leading scientists at the Lamont-Doherty Geological Observatory at Columbia University. One of the program's primary goals was to "develop expertise to assess the possible impact of the greenhouse effect on Exxon business."[16]

b.    In October 1979, an Exxon scientist produced a confidential report that identified "[t]he most widely held theory" about climate change was as follows:[17]

```
•  The increase is due to fossil fuel combustion
•  Increasing CO2 concentration will cause a warming of the earth's
   surface
•  The present trend of fossil fuel consumption will cause dramatic
   environmental effects before the year 2050.
```

c.    The same Exxon scientist accurately projected that without restrictions on fossil fuel combustion, "noticeable temperature changes" would begin to occur when atmospheric $CO_2$ concentrations reached 400 ppm around 2010.[18] These findings were distributed widely to Exxon management, but not shared publicly. Atmospheric $CO_2$ concentrations reached 401 ppm in 2015.

d.    Later that year, Exxon's Shaw wrote to his supervisor, Harold N. Weinberg, advocating for Exxon to launch "a very aggressive defensive program in the indicated areas of atmospheric science and climate because there is a good probability that legislation affecting our business will be passed."[19]

---

[16] Edward A. Garvey et al., *Proposed Exxon Research Program to Help Assess the Greenhouse Effect* 3 (Mar. 26, 1979), https://www.documentcloud.org/documents/2805570-1979-Exxon-Proposal-to-Help-NOAA-Assess/.

[17] Steve Knisely, Exxon Research & Eng'g Co., *Controlling the CO2 Concentration in the Atmosphere* 1 (1979), https://www.documentcloud.org/documents/2805569-1979-Exxon-Memo-on-Potential-Impact-of-Fossil/.

[18] *Id.* at 5.

[19] Memo from Henry Shaw to H.N. Weinberg on Research in Atmospheric Science 2 (Nov. 19, 1979), https://www.documentcloud.org/documents/2805571-1979-Memo-on-Atmospheric-Science-Research-And/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 25

e.    Also in 1979, API launched the $CO_2$ and Climate Task Force—later renamed the Climate and Energy Task Force—("API Task Force")—to monitor and share climate research among its member companies, including Defendants. In a meeting early in the existence of the group, Texaco's Bruce Bailey suggested that the API Task Force "should be the focal point and establish a basis for providing API comments on $CO_2$ and climate matters."[20]

4.46.    Through these internal research programs and task forces, Defendants developed an advanced understanding that the greenhouse effect, caused primarily by fossil fuel combustion, would produce "catastrophic" impacts for "a substantial fraction of the earth's population." Defendants did not share this knowledge with the public but used it to inform their own business strategy.

a.    API prepared a background paper on carbon dioxide and climate for Exxon Vice President William "Bill" Slick in September 1979. Commenting on the draft, an Exxon scientist noted that by the time the "warming effects of $CO_2$ will be apparent," around or after the year 2000, natural cyclic warming trends will "worsen[] the effect."[21]

b.    Members of API's Task Force, including representatives from SOHIO (now BP), Texaco (now Chevron), Exxon, and API, met with Dr. John Laurmann, "a recognized expert in the field of $CO_2$ and climate," in February 1980. The Task Force's goals for the meeting were to "[i]ncrease industry's understanding of the $CO_2$ and climate problem"; "[d]etermine if there are feasible and valuable research projects that could be accomplished by API"; and "[e]stablish a mechanism to prepare any needed issue papers."[22]

c.    Dr. Laurmann told the API Task Force there was "strong empirical evidence" that rising carbon levels were "mainly due to fossil fuel burning" and there was "scientific consensus" that increased carbon levels could cause "large future climatic

---

[20] API, $CO_2$ and Climate Task Force, *Minutes of Meeting* 1 (Feb. 29, 1980), https://www.documentcloud.org/documents/3483045-AQ-9-Task-Force-Meeting-1980/.
[21] Memo from Raymond J. Campion, Exxon Res. & Eng'g, to J.T. Burgess (Sep. 6, 1979), https://www.documentcloud.org/documents/4378064-1979-Exxon-Memo-about-API-s-CO2-Research-Strategy/.
[22] API, $CO_2$ and Climate Task Force, *Minutes of Meeting* 1 (Feb. 29, 1980), https://www.documentcloud.org/documents/3483045-AQ-9-Task-Force-Meeting-1980/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 26

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

response[s]."[23] The resulting temperature increases, he projected, would have "catastrophic" impacts.[24]



*Figure 4* Slide from Dr. Laurmann's February 1980 presentation to the API Task Force.

d.    Exxon researchers produced a technological forecast on the "$CO_2$ greenhouse effect" in December 1980, concluding "there is little doubt" that $CO_2$ was increasing, and that fossil fuel combustion was a primary cause.[25] The scientists calculated that a doubling of atmospheric $CO_2$ could occur around 2060, "most likely" resulting in a $3.0 \pm 1.5°C$ increase in global average temperatures, and leading to "dramatic" impacts such as changes in global precipitation changes and soil moisture.[26]

e.    In February 1981, Exxon staff sent high level managers and executives an internal "scoping study" assessing whether Exxon should expand its existing $CO_2$ research program. The study acknowledged that increasing $CO_2$ was "causing considerable concern due to potential climate effects" but recommended against expanding the program because of a lack of "near term threat of legislation to control $CO_2$."[27]

---

[23] *Id.* at Att. B1–B2.
[24] *Id.* at Att. B5.
[25] Henry Shaw & Pat McCall, *Exxon Research and Engineering Company's Technology Forecast: CO2 Greenhouse Effect* 1 (Dec. 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And/.
[26] *Id.* at 3.
[27] Memo from G.H. Long, Exxon Res. & Eng'g Co. on *Atmospheric CO2 Scoping Study* 1, 13 (Feb. 5, 1981), https://www.documentcloud.org/documents/3215114-Exxon-Review-of-Climate-Research-Program-1981/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 27

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

f.      Later that year, Exxon scientist Roger Cohen warned colleagues that it was "distinctly possible" that Exxon Corporate Planning Department's projections for future fossil fuel consumption levels would "produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)," and suggesting otherwise "may be too reassuring."[28]



*Figure 5* Memo from Roger Cohen to Exxon colleagues warning of the severity of impending climate change.

g.      In March 1982, a project for API by Exxon-funded scientists at Columbia University revealed that, despite differences among climate model predictions, there was consensus that doubling of $CO_2$ would result in an average global temperature rise, with

---

[28] Memo from Roger Cohen, Exxon, to Werner Glass, Exxon 1 (Aug. 18, 1981), https://www.documentcloud.org/documents/2805574-1981-Exxon-Memo-on-Possible-Emission/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

the studies predicting an "increase of temperature within a global mean range of 4°C."[29] The scientists told API that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."[30] Later that year, Cohen confirmed that Exxon's own climate modeling was "in accord" with the same **"scientific consensus."**[31]

        h.     At an Exxon conference in 1984, Exxon scientist Henry Shaw delivered a presentation wherein he acknowledged the "catastroph[ic]" nature of the risks posed by an increase of $CO_2$ accumulation in the atmosphere, including "[d]etrimental health effects," but that there was still "adequate time to study the problem."[32]

        i.     An independent analysis of Exxon's climate change projections from the late 1970s and early 1980s found that they were highly accurate: "63 to 83% of the climate projections reported by ExxonMobil scientists were accurate in predicting subsequent global warming."[33] According to the researchers, Exxon "didn't just know 'something' about global warming decades ago—they knew as much as academic and government scientists knew."

    4.47.   As evidenced by the consensus highlighted in both the API-commissioned study and Exxon's own research, scientists within and outside of industry agreed about both the causes and consequences of climate change by the 1980s. Shell provides additional evidence of this:

        a.     In 1988, Shell scientists issued its own confidential, internal report on the greenhouse effect and its findings strikingly aligned with those of other scientists. The study acknowledged that fossil fuel combustion was the primary driver of global warming and

---

[29] API, *Climate Models and $CO_2$ Warming: A Selective Review and Summary* 4–5 (Mar. 1982), https://www.documentcloud.org/documents/2805626-1982-API-Climate-Models-and-CO2-Warming-a/.
[30] *Id.* at 5.
[31] Memo from Roger W. Cohen, Exxon Res. & Eng'g Co., to A.M. Natkin, Exxon Corp. Off. of Sci. & Tech. 1–2 (Sept. 2, 1982) (emphasis added), https://www.documentcloud.org/documents/2805575-1982-Exxon-Memo-Summarizing-Climate-Modeling/.
[32] Henry Shaw, *Presentation to EUSA/ER&E Environmental Conference: CO2 Greenhouse and Climate Issues* 7, 14 (Mar. 28, 1984), https://www.documentcloud.org/documents/6530733-1984-Exxon-Henry-Shaw-Presentation-CO2/.
[33] Geoffrey Supran et al., *Assessing ExxonMobil's Global Warming Projections*, 379 Science eabk0063 at 1 (2023), https://doi.org/10.1126/science.abk0063open_in_new.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

would lead to "major social, economic and political consequences" at a time scale "beyond the lifetime of most of the present decision makers but not beyond intimate (family) association."[34]

       b.     In the report, Shell's scientists warned of severe environmental impacts such as changing air temperature, which would necessitate "costly" building adaptations that "would drastically change the way people live and work."[35] To cope with these changes, "adaptation, migration and replacement could be called for," all of which would be "costly and uncertain, but could be made acceptable."[36] Though finding that $CO_2$-induced impacts would likely not be detectable before the year 2000, the scientists recommended urgent action to mitigate future harm:[37]

> It is estimated that any climatic change relatable to CO2 would not be detectable before the end of the century. With the very long time scales involved, it would be tempting for society to wait until then before doing anything. The potential implications for the world are, however, so large that policy options need to be considered much earlier. And the energy industry needs to consider how it should play its part.

    4.48.   As Shell's scientists recommended, the fossil fuel industry—including Defendants—did consider how it should play its part in the looming climate crisis and came out of that consideration with the decision to prioritize their own bottom line above the safety and welfare of their customers, the planet, and public writ large.

**D.    While Julie was raising her daughter, Defendants knew that the only way to protect against their products' climate-related risks was to reduce the widespread use of and dependence on fossil fuels.**

    4.49.   Based on their advanced understanding of how their fossil fuel products caused carbon dioxide to accumulate in the atmosphere, warm the planet, and imperil humanity, Defendants knew that fossil fuel use must be reduced. In addition, Defendants knew that the effects of this causal chain could not be reversed unless preventative action was taken before the effects of $CO_2$ accumulation in the atmosphere were realized.

---

[34] R.P.W.M. Jacobs et al., Greenhouse Effect Working Group, Shell Internationale Petroleum Maatschappij B.V., *The Greenhouse Effect* 1, 25 (1988), https://www.documentcloud.org/documents/4411090-Document3/.
[35] *Id.* at 27.
[36] *Id.* at 25.
[37] *Id.* at 6.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 30

a.    A 1979 confidential Exxon report, which accurately predicted atmospheric $CO_2$ concentrations 30 years into the future, noted that "there is a possibility that an atmospheric $CO_2$ buildup will cause adverse environmental effects in enough areas of the world to consider limiting the future use of fossil fuels as major energy sources."[38] The report further concluded: "If it becomes necessary to limit future $CO_2$ emissions without practical removal/disposal methods, coal and possibly other fossil fuel resources could not be utilized to an appreciable extent."[39]

b.    By 1981, Exxon knew that "[i]ndirect control measures, such as energy conservation or shifting to renewable energy sources" were "the only options that might make sense" for reducing atmospheric carbon dioxide buildup, given the "exorbitant" cost of "scrubbing large quantities of $CO_2$ from flue gases."[40]

c.    In 1982, a proprietary report circulated to Exxon managers and executives synthesized the current state of knowledge regarding the "$CO_2$ greenhouse effect" and similarly indicated that "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion."[41]

d.    In 1988, Shell acknowledged in a confidential report: "An overall reduction in fossil fuel use would of course reduce $CO_2$ production and could be achieved by constraint on energy consumption, by improved thermal efficiency and by replacing fossil fuels with e.g. nuclear power. But such a course of action would imply a major shift in world energy supply and use."[42]

e.    A year later, in a series of confidential 1989 scenario planning documents, Shell outlined two future $CO_2$ emissions scenarios: SUSTAINABLE WORLD (labeled "SW") and GLOBAL MERCANTILISM (labeled "GM"). In the Sustainable World

---

[38] Steve Knisely, Exxon Research and Engineering Company, *Controlling the $CO_2$ Concentration in the Atmosphere* 1 (1979), https://www.documentcloud.org/documents/2805569-1979-Exxon-Memo-on-Potential-Impact-of-Fossil/.
[39] *Id.* at 2.
[40] R.E. Barnum, Exxon Research and Engineering Company, *Scoping Study on $CO_2$* 13 (1981), https://www.documentcloud.org/documents/3215114-Exxon-Review-of-Climate-Research-Program-1981/.
[41] Exxon Research & Engineering CO., *$CO_2$ "Greenhouse Effect": Summary* 2 (1982), https://www.documentcloud.org/documents/2805576-1982-Exxon-Memo-to-Management-About-CO2/.
[42] R.P.W.M. Jacobs et al., Greenhouse Effect Working Group, Shell Internationale Petroleum Maatschappij B.V., *The Greenhouse Effect* 28 (1988), https://www.documentcloud.org/documents/4411090-Document3/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

scenario, fossil fuel use would be sharply curtailed around 2000, and global mean temperature rise would resultingly be limited to an estimated 0.5 to 1.5°C by 2050. In the Global Mercantilism scenario, fossil fuel use and $CO_2$ emissions would continue to increase, resulting in concentrations of atmospheric $CO_2$ of around 490 ppm by 2050, and global mean temperature could rise of "considerably more" than 1.5°C.[43]



*Figure 6* Comparison of atmospheric $CO_2$ concentrations in 2020 under Shell's GM Scenario prediction (left) and the observed concentrations at the Mauna Lao Observatory (right).

       f.      Concentrations of atmospheric $CO_2$ today accurately track Shell's 1989 predictions for the Global Mercantilism scenario, as illustrated by the graphs above, which show remarkable precision between Shell's prediction for 2020 and the observed atmospheric $CO_2$ concentrations in that same year. Shell predicted that, in the Global Mercantilism scenario, human systems would be most impacted: "[T]he potential refugee problem in GLOBAL MERCANTILISM could be unprecedented," "[c]onflicts would abound," and "[c]ivilisation could prove a fragile thing."[44]

---

[43] Shell Confidential Group Planning, *Scenarios 1989 - 2010: Challenge and Response* 35–36 (1989), https://www.documentcloud.org/documents/23735737-1989-oct-confidential-shell-group-planning-scenarios-1989-2010-challenge-and-response-disc-climate-refugees-and-shift-to-non-fossil-fuels/.

[44] Shell Confidential Group Planning, *Scenarios 1989 - 2010: Challenge and Response* 36 (1989), https://www.documentcloud.org/documents/23735737-1989-oct-confidential-shell-group-planning-scenarios-1989-2010-challenge-and-response-disc-climate-refugees-and-shift-to-non-fossil-fuels/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

4.50.    Defendants knew that alternative energy sources were needed to mitigate the threat of climate change. They also knew that urgent action was needed because replacing fossil fuels with alternative energy sources would take several decades.

a.    In 1980, Defendant members of API's Task Force, discussed the possibility of exploring alternative energies, including "the technical implications of energy source changeover, research timing and requirements."[45] During the meeting, API consultant John Laurmann commented that "market penetration time theory says there is no leeway" for action.[46]

b.    Later that year, Exxon researchers estimated that it could take alternative energy sources like solar or nuclear at least 50 years to completely displace fossil fuel power generation.

c.    In 1979, the head of Exxon's Research and Engineering Company wrote to Exxon's Senior Vice President to advocate for using Exxon's research and data on the greenhouse effect to "influence Exxon's view about the long-term attractiveness of coal and synthetics relative to nuclear and solar energy."[47]

d.    In a 1988 speech, Mobil Oil President Richard F. Tucker discussed strategies to combat the so-called "greenhouse effect," explaining: "Prevention on a global scale may even require a **dramatic reduction in our dependence on fossil fuels** – and a shift toward solar, hydrogen, and safe nuclear power."[48]

e.    In a 1989 internal publication, Exxon scientist Brian Flannery identified developing alternative energy sources as a necessary means to limit the growth of $CO_2$ emissions: "Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on

---

[45] API, $CO_2$ and Climate Task Force, *Minutes of Meeting* 2 (Feb. 29, 1980), https://www.documentcloud.org/documents/3483045-AQ-9-Task-Force-Meeting-1980/.
[46] *Id.* at Att. B7.
[47] Letter from Edward E. David, Jr., President, Exxon Res. & Eng'g Co., to George T. Piercy, Senior Vice-President, Exxon Corp. (Nov. 9, 1979), https://www.documentcloud.org/documents/2805572-1980-Exxon-Memo-on-the-Company-View-and-Position/.
[48] Richard F. Tucker, Mobil Oil Corp., *High Tech Frontiers in the Energy Industry*, *in* VITAL SPEECHES OF THE DAY address to the AIChE National Meeting, Washington D.C., Nov. 30, 1989, at 437, 440 (emphasis added), https://babel.hathitrust.org/cgi/pt?id=pur1.32754074119482&view=1up&seq=528&q1=the+challenge+ahead.

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

developing alternative energy sources."[49] In the same article, Flannery explained how efforts to curb fossil fuel use posed a greater threat to Exxon than any potential climate impacts: "Impacts on Exxon will come sooner from society's efforts to reduce potential risks from climate change than from change itself."[50]

**E.    Instead of warning the public and consumers about the dangers of their products, Defendants launched a campaign of deception to downplay and discredit the risks of climate change and ensure growing demand for their fossil fuel products.**

4.51.    In the late 1980s and early 1990s, several events catalyzed widespread public awareness of climate change for the first time:

a.    In June 1988, NASA scientist James Hansen testified to Congress that human activities were causing global warming. The testimony was widely publicized, receiving coverage on the front page of the *New York Times.*

b.    That same year, the United Nations formed the Intergovernmental Panel on Climate Change ("IPCC"), a panel of scientific experts charged with assessing available scientific information on climate change, its impacts, and potential response strategies.[51] The IPCC issued its first report in 1990 and a supplement in 1992, which concluded: "emissions from human activities are substantially increasing the atmospheric concentrations of greenhouse gases"; burning fossil fuels was responsible for 70-90% of those emissions; and the increase in greenhouse gasses will warm the Earth's surface, leading to serious environmental damage.[52] The IPCC found these risks sufficient to justify **immediate** "use of cleaner, more efficient energy sources with lower or no emissions of greenhouse gases."[53]

4.52.    Defendants anticipated that increased awareness of climate change would affect consumer behavior. Shell contemplated the possibility that growing awareness "might change peoples' attitudes towards non-fossil [fuel] energy sources" and "swing opinion away from

---

[49]  Brian Flannery, *Greenhouse Science*, CONNECTIONS (Exxon Research & Eng'g Co.), Fall 1989, https://www.documentcloud.org/documents/3112028-1989-Connections-Article-on-Technology-s-Place/.
[50] *Id.*
[51] J.P. Bruce & A.T. Brough, *Memorandum of Understanding Between the United Nations Environment Programme (UNEP) and the World Meteorological Association (WMO) on the Intergovernmental Panel on Climate Change (IPCC)* 1 (1989), https://perma.cc/9JMA-4YZH.
[52] IPCC, *Climate Change: The IPCC 1990 and 1992 Assessments* 52, 57 (1992), https://perma.cc/PKA5-HYYS.
[53] *Id.* at 57.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 34

fossil fuel combustion" in favor of "conservation, renewable sources and particularly in nuclear energy."[54] In response, Defendants launched a far-reaching campaign to obscure and discredit the findings their own scientists had helped develop.

4.53.    Several months after James Hansen testified to Congress that fossil fuel use was altering the global climate, an Exxon public affairs official produced a memo outlining Exxon's public relations strategy on the greenhouse effect.  In opposition to the findings of its own scientists that were in accord with the scientific consensus, the memo stated Exxon's public "position" would be to:[55]

> **EXXON POSITION**
>
> O  EMPHASIZE THE UNCERTAINTY IN  SCIENTIFIC CONCLUSIONS REGARDING  THE POTEN-
>    TIAL ENHANCED GREENHOUSE EFFECT.

4.54.    Around the same time, Exxon's head of corporate research, Frank Sprow, sent a memo to colleagues outlining the threat posed by GHG regulation, articulating what would ultimately become Exxon policy and the company's new direction for climate science research:

> If a worldwide consensus emerges that action is needed to mitigate against Greenhouse gas effects, substantial negative impacts on Exxon could occur[.] . . . Any additional R&D efforts within Corporate Research on Greenhouse should have two primary purposes: 1. Protect the value of our resources (oil, gas, coal). 2. Preserve Exxon's business options.[56]

4.55.    Exxon was "providing leadership through API in developing the petroleum industry position."[57]

4.56.    Together, Defendants launched a campaign of deception to downplay and discredit the risks of climate change. Despite earlier acknowledging a growing consensus

---

[54] R.P.W.M. Jacobs et al., Greenhouse Effect Working Group, Shell Internationale Petroleum Maatschappij B.V., The Greenhouse Effect 19, 28 (1988), https://www.documentcloud.org/documents/4411090-Document3/.

[55] Joseph M. Carlson, *The Greenhouse Effect* 7 (Aug. 3, 1988), https://www.documentcloud.org/documents/3024180-1998-Exxon-Memo-on-the-Greenhouse-Effect/.

[56] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, WALL STREET J. (Sept. 14, 2023, 5:30 AM), https://www.wsj.com/business/energy-oil/exxon-climate-change-documents-e2e9e6af.

[57] Joseph M. Carlson, *The Greenhouse Effect* 7 (Aug. 3, 1988), https://www.documentcloud.org/documents/3024180-1998-Exxon-Memo-on-the-Greenhouse-Effect/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

about the causes and consequences of climate change, Defendants' campaign obscured the certainty of the science, preventing public awareness and preparedness and securing continued demand for their fossil fuel products.

*1.      Defendants formed and funded front groups to conceal and misrepresent the dangers of their fossil fuel products.*

4.57.    Beginning in the late 1980s, Defendants led and participated in groups with the intent and effect of eroding public certainty in climate science, retaining demand for fossil fuels, limiting demand for competing energy options and increasing profits. These groups included API, the International Petroleum Industry Environmental Conservation Association ("IPIECA"), and the Global Climate Coalition ("GCC"). Defendants knew that their conduct as it related to climate change, by and through these trade groups and associations among others, would adversely impact "a substantial fraction of the population."[58]

4.58.    The same year Exxon's Frank Sprow sketched out the new "petroleum industry position," Defendants formed an "Ad Hoc Group on the Greenhouse Effect," later renamed the "Working Group on Global Climate Change," under the auspices of IPIECA.[59] The group was chaired by Duane LeVine, Exxon's manager of science and strategy development.

4.59.    In 1990, the IPIECA Working Group, which included representatives from API, BP, Mobil, Shell, Texaco (now Chevron), and Saudi Aramco, distributed a briefing document to its member companies. The briefing, authored by LeVine, warned that international efforts to limit greenhouse gas emissions were imminent. Contradicting Exxon scientists' own research and findings, LeVine asserted:[60]

---

[58] Memo from G.H. Long, Exxon Res. & Eng'g Co. on *Atmospheric CO2 Scoping Study* 1, 13 (Feb. 5, 1981), https://www.documentcloud.org/documents/3215114-Exxon-Review-of-Climate-Research-Program-1981/.
[59] Benjamin A. Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020* 138 (2022), https://purl.stanford.edu/hq437ph9153 (citing interview with Brian P. Flannery, Feb. 1, 2021).
[60] Duane G. Levine, *Potential Enhanced Greenhouse Effects: Status and Outlook*, Presentation to the Board of Directors of Exxon Corporation 1 (Feb. 22, 1989), https://www.documentcloud.org/documents/3024140-1989-Presentation-to-Exxon-Board-of-Directors-on/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

Bechtold Law Firm, PLLC
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 36

IN SPITE OF THE RUSH BY SOME PARTICIPANTS IN THE GREENHOUSE DEBATE TO DECLARE THAT THE SCIENCE HAS DEMONSTRATED THE EXISTENCE OF PEG TODAY...I DO NOT BELIEVE SUCH IS THE CASE. ENHANCED GREENHOUSE IS STILL DEEPLY IMBEDDED IN SCIENTIFIC UNCERTAINTY, AND WE WILL REQUIRE SUBSTANTIAL ADDITIONAL INVESTI- GATION TO DETERMINE THE DEGREE TO WHICH ITS EFFECTS MIGHT BE EXPERIENCED IN THE FUTURE.

LeVine argued there was need for greater emphasis on the uncertainties in climate science and advocated for further research to stave off "irreversible and costly Draconian steps" that could shift the energy resource mix away from fossil fuels.[61]

4.60.    Around the same time, in 1989, several companies and trade associations from high-emitting industries founded the GCC, an industry front group that opposed greenhouse gas regulations. The GCC's original members included API, Amoco (BP), Shell, Phillips Petroleum (ConocoPhillips), and Texaco (Chevron). By 1996, the GCC's membership also included BP America, Chevron, Exxon, and Mobil.

a.    The GCC's stated position on climate change, in contradiction to its member companies' long-standing knowledge, was that "most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is [a human-caused] component to this observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend."[62] The GCC further claimed that "there is no convincing evidence that future increases in greenhouse gas concentrations will produce significant climatic effects."[63]

b.    Despite what the GCC said publicly, the coalition internally acknowledged that the alternative theories to anthropogenic climate change were unfounded. A draft version of a GCC primer on climate science acknowledged that such theories "[did] not offer convincing arguments against the conventional model of greenhouse gas emission-

---

[61] Id. at 31; see also Benjamin A. Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020 139 (2022), https://purl.stanford.edu/hq437ph9153.
[62] GCC, Global Climate Coalition: An Overview 2 (1996), https://www.documentcloud.org/documents/5453339-1996-GCC-Overview-and-Reports.
[63] Id.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 37

Bechtold Law Firm, PLLC
PO Box 7051, Missoula, MT 59807
(406) 721-1435

induced climate change."[64] This acknowledgement was omitted from the final version of the report. Instead, Defendants and the GCC continued to promote many of the same contrarian theories they privately rejected.

4.61.    In April 1995, the United Nations hosted the first Conference of Parties ("COP") to the UN Framework Convention on Climate Change ("UNFCCC") in Berlin, Germany, where delegates from 118 countries agreed to develop an international agreement to stabilize greenhouse gas emissions within two years. In the lead-up to COP through the following year, the GCC and API launched a campaign specifically targeted at obscuring their member companies' findings on climate change:

a.    In 1995, the GCC commissioned a report from Accu-Weather, Inc. entitled "Changing Weather? Facts and Fallacies about Climate Change." Published two months before COP, the report disputed the existence of anthropogenic global warming, asserting: "While slight global warming has occurred within the past 100 years, this increase falls within the limits of natural climate variability and does not signal an internally forced ("greenhouse") global warming . . . ."[65]

b.    After COP, in May 1995, the GCC published a booklet entitled "Climate Change: Your Passport to the Facts." The GCC falsely asserted: "While many warnings have reached the popular press about the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will actually occur."[66] The booklet cited the GCC-sponsored Accu-Weather report, portraying it as an independent study.

4.62.    The following year, in 1996, API published a book, *Reinventing Energy: Making the Right Choices*, that falsely claimed: "Currently, no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea

---

[64] GCC, *Predicting Future Climate Change: A Primer (Approval Draft)* 16 (1995), https://www.documentcloud.org/documents/4895861-Predicting-Future-Climate-Change-a-Primer.
[65] Accu-Weather, Inc., *Changing Weather? Facts and Fallacies about Climate Change* 1 (1995), https://www.documentcloud.org/documents/5628891-GCC-Accu-Weather-Report-Changing-Weather.
[66] GCC, *Climate Change: Your Passport to the Facts* 1 (1995), https://www.documentcloud.org/documents/5628109-Climate-Change-Your-Passport-to-the-Facts.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

levels, rainfall, surface temperatures or the intensity and frequency of storms."[67] The API authors argued that, in the event climatic changes did occur in the future, society would easily be able to adapt:

> If a change occurred in air temperature . . . relatively little adaptation would be needed—especially if average temperatures rose slightly only at night and remained the same during the day. This happened during the 1980s, and most people easily adapted. Given these historical patterns, we have no need to worry if the global climate becomes somewhat warmer over a 100-year period.[68]

4.63.    The GCC consistently downplayed the urgency and threats posed by climate change. In 1996, the *New York Times* reported that experts warned climate change could cause "thousands of additional deaths each year during heat waves" in major cities, and concluded that a "wait-and-see approach would be imprudent at best and nonsensical at worst." In a press conference, the GCC's executive director, John Shlaes, responded: "The time for decision is not yet now." [69]

4.64.    Also in 1996, mainstream media outlets reported that 1995 was the "hottest year on record" due to fossil fuel-induced climate change. Behind the scenes, the GCC and its member companies strategized to undermine this assessment:

a.    GCC staffer Bronson Gardner was "experimenting with different ways of looking at [temperature] data" to help Texaco executive Clement "Clem" Malin "challenge" whether "1995 was *really* that much hotter than normal, or whether the data were 'blown out of proportion.'"[70] Gardner created the chart shown below, comparing the mean temperature for each month between January 1995 to May 1996 against the all-time record high

---

[67] API, *Reinventing Energy: Making the Right Choices* 79 (1996), https://www.documentcloud.org/documents/4224133-Reinventing-Energy.
[68] *Id.* at 87.
[69] John H. Cushman Jr., *Report Says Global Warming Poses Threat to Public Health*, N.Y. TIMES (July 8, 1996), https://www.nytimes.com/1996/07/08/world/report-says-global-warming-poses-threat-to-public-health.html.
[70] Memo from Bronson Gardner, GCC, to Lenny S. Bernstein on 1995–The Hottest Year on Record? 2 (June 10, 1996), https://www.documentcloud.org/documents/5689156-AIAM-051229/?mode=document.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

temperature for that month, making it appear as though 1995 was significantly *cooler* than other years.



*Figure 7* Deceptive graph created by GCC, comparing mean temperature records from 1995 and 1996 to all-time records.

Gardner forwarded this intentionally misleading portrayal of the data to several colleagues, including Mobil's Lenny S. Bernstein, Texaco's Jim Pinto, the National Mining Association's Connie Holmes, and the GCC's Don Rheem and John Shlaes.

4.65.    Defendants, through the GCC, conspired to increase the perceived uncertainty around the health impacts of climate change and sought out partnerships with health-focused organizations to amplify their deceptive messaging:

a.    In a September 19, 1996, meeting of the GCC Science and Technology Assessment Committee ("STAC"), Exxon's Dennis Devlin delivered a presentation summarizing published literature on the potential impacts of climate change on human health.[71] Notably, Devlin discussed the expert "hypothesis" that "sudden extreme increases in ambient temps result in 'excess' deaths," particularly among "elderly, sick, [and] very young" people who "have limited physiological capacity to adapt."[72] Though "most researchers publishing in the area of climate change health impacts [were] proponents of the view that climate change

---

[71] GCC, *Global Climate Coalition Science and Technology Assessment Committee – Meeting Minutes of Sept. 19, 1996* 1 (1996), https://www.documentcloud.org/documents/5631463-AIAM-051494.

[72] D.J. Devlin, *Purported Impact of Climate Change on Human Health* 9 (1996), https://www.documentcloud.org/documents/3215116-Purported-Impact-of-Climate-Change-on-Human-Health.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 40

could cause serious health impacts," Devlin advocated that the GCC support "scientific work in this area by scientists that would present a more balanced view."[73]

b.    Later in the meeting, the STAC discussed how the "GCC could increase involvement in the issue" of climate-related health impacts.[74] Lenny Bernstein, Mobil employee and STAC co-chair, planned to contact organizations to "help" with the health effects issue, including the industry-funded think tank, American Council on Science and Health ("ACSH"). This conclusion contradicted scientific consensus at the time, as described in the IPCC's 1995 Second Assessment Report:

- "Climate change is likely to have wide-ranging and mostly adverse impacts on human health, with significant loss of life. Direct health effects include increases in (predominantly cardio-respiratory) mortality and illness due to an anticipated increase in the intensity and duration of heat waves."[75]

- "An increased frequency or severity of heat waves would cause an increase in (predominantly cardiorespiratory) mortality and illness (High Confidence)."[76]

- "[I]t can be predicted confidently that climate change would, via increased exposure to heat waves, cause additional heat-related deaths and illnesses."[77]

c.    In a January 1997 meeting, GCC executive director, John Shlaes, asserted that, "[t]he health issue is increasing in importance with the climate change issue. . . . The GCC has got to be prepared to respond to the issue this year."[78] STAC then approved a grant to the ACSH to produce a study on the health effects of climate change.

---

[73] GCC, *Global Climate Coalition Science and Technology Assessment Committee – Meeting Minutes of Sept. 19, 1996* 1 (1996), https://www.documentcloud.org/documents/5631463-AIAM-051494.
[74] *Id.* at 2.
[75] IPCC, *IPCC Second Assessment: Climate Change 1995* 8 (1995), https://perma.cc/N8JV-CMBG.
[76] IPCC, *Climate Change 1995: Impacts, Adaptations and Mitigation of Climate Change: Scientific-Technical Analyses* 563 (1996), https://www.ipcc.ch/report/ar2/wg2/.
[77] *Id.* at 569.
[78] GCC, *Global Climate Coalition Science and Technology Assessment Committee – Meeting Minutes of January 16, 1997* (1997), https://www.documentcloud.org/documents/5689215-AIAM-052205.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 41

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

d.      Several months later, in October 1997, ACSH produced such a report, which claimed: "Severe limiting of GHG emissions seems unnecessary at present: If hypothetical human-induced global climate change occurs as projected—i.e., slowly and moderately—there is time to develop affordable mitigative technology before future global climate change has a significant impact on human population health."[79] ACSH did not identify the GCC as a funder.

e.      The ACSH report also included a subsection on heat-related deaths, asserting "[a] globally averaged warming of 1 to 3.5°C by the year 2100 probably would not affect the incidence of heat-related death."[80]

f.      In 1997, GCC produced its own report on climate change and health effects aimed at deflecting attention from the potentially severe health consequences of global warming, which argued: "Attempting to link global climate change and adverse health impacts requires a long and very tenuous stretch. Attention to this labored hypothesis detracts from a much needed focus on solid, identifiable ways to improve public health around the globe."[81]

4.66.    After the Kyoto Protocol—a legally binding, international agreement committing industrialized countries to reduce greenhouse gas emissions—was adopted at the third COP to the UNFCCC in December 1997, Defendants and their groups used misinformation about climate science to sway opinion and erode public support for the Protocol:

a.      In April 1998, API formed a task force, the Global Climate Science Communications Team ("GCSCT"), with representatives from Exxon, API, and Chevron, and several consultants who had previously worked for the tobacco industry, sowing doubt about the health risks of smoking. The GCSCT put together a communications plan designed to decrease public certainty in climate science and erode support for the Kyoto Protocol. The plan asserted: "Unless 'climate change' becomes a non-issue, meaning that the Kyoto proposal is

---

[79] Sidney Shindell & Jack Raso, *Global Climate Change and Human Health: A Position Paper of the American Council on Science and Health* 9 (1997), https://perma.cc/CQN8-YAHP.
[80] *Id*. at 10.
[81] GCC, *Issues Related to Potential Health Impacts Resulting from Climate Change* 1 (1997), https://www.documentcloud.org/documents/5631474-1997-02-25-Issues-Related-to-Potential-Health.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 42

defeated and there are no further initiatives to thwart the threat of climate change, there may be no moment when we can declare victory for our efforts."[82]

b.    The communications plan laid out an extensive, integrated public relations campaign aimed at "undercutting the 'prevailing scientific wisdom' [on climate change]" at a cost of nearly $7 million, stating:[83]



c.    One year later, an internal API budget document asserted: "Climate is at the center of industry's business interests. **Policies limiting carbon emissions reduce petroleum product use.** That is why it is API's highest priority issue and defined as 'strategic.'"[84]

d.    In March 2001, President George W. Bush rejected the Kyoto Protocol. Three months later, Under Secretary of State for Global Affairs, Paula Dobriansky, met with members of the GCC and planned to inform the group of the impact of their efforts: "POTUS rejected Kyoto, in part, based on input from you."[85]

4.67.    Defendants and their trade associations continue to deceptively promote unabated fossil fuel consumption through front groups. For example, in 2014, a leaked presentation revealed that WSPA had "activated" more than a dozen front groups to oppose climate regulations in the western United States, including in Washington. The WSPA-created groups were designed to look and sound like grassroots coalitions, with names like

---

[82] GCSCT, *Draft Global Science Communications Action Plan* 3 (1998), https://www.documentcloud.org/documents/2840903-1998-API-Global-Climate-Science-Communications/.
[83] *Id*. at 3–7.
[84] *Political Interference with Science: Global Warming, Part II before H. Comm. on Oversight & Gov't Reform*, 110th Cong., Compilation of Exhibits, Exh. H (2007) (API, *Strategic Issue – Climate Change* 3), https://perma.cc/X83H-UYG4.
[85] Memo from Ken Brill to Paula Dobriansky on Your Meeting with Members of the Global Climate Coalition, June 21, 2001, 9:10 - 9:50 a.m. 3 (June 20, 2001), https://www.documentcloud.org/documents/4407192-Global-Climate-Coalition-Meeting-2001/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 43

"Washington Consumers for Sound Fuel Policy," but were in fact created to stealthily promote oil and gas industry messaging to consumers and other key decisionmakers.

4.68.   In 2021, ExxonMobil lobbyist Keith McCoy affirmed that the company had long participated in "shadow groups" to fight against climate science: "Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. But there's nothing, there's nothing illegal about that. We were looking out for our investments. We were looking out for our shareholders."[86]

**2.    *Defendants sowed uncertainty about climate science and interfered with efforts to reduce fossil fuel consumption that they knew were necessary to prevent the catastrophic risks of climate change.***

4.69.   In addition to acting in concert through their trade associations and front groups to undermine public certainty about climate science, Defendants were also spreading their climate-denial messages through publications, speeches, and advertisements targeting stakeholders and consumers:

a.      In 1993, Mobil (now ExxonMobil) published an advertisement in the *New York Times*, proclaiming: "[T]he greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable."[87] The advertisement also quoted the conclusions of industry-funded scientists Robert C. Balling and S. Fred Singer, arguing that "the highly touted greenhouse disaster is most improbable."

b.      In 1994, Shell produced a report on the greenhouse effect, contradicting its earlier stance that climate change risked "major social, economic and political consequences" if urgent action was not taken.[88] Instead, Shell adopted Exxon's position to "emphasize the uncertainty" of climate change: "The Group position is that: Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas

---

[86] *See* Alex Thomson, *Revealed: ExxonMobil's Lobbying War on Climate Change Legislation*, 4NEWS (June 30, 2021), https://perma.cc/QX2F-2WKH.

[87] Mobil, *Apocalypse No*, N.Y. TIMES (Feb. 25, 1993), https://www.documentcloud.org/documents/357243-1993-2-25-mob-nyt-apocalypse-no/.

[88] R.P.W.M. Jacobs et al., *The Greenhouse Effect* 1 (1988), https://www.documentcloud.org/documents/4411090-%20Document3.html#document.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 44

**Bechtold Law Firm, PLLC**
PO BOX 7051, MISSOULA, MT 59807
(406) 721-1435

emissions beyond 'no regrets measures' could be premature, divert resources from more pressing needs and further distort markets."[89]

c. In 1996, Exxon published a report, entitled "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers," with articles by Exxon CEO Lee Raymond and the Competitive Enterprise Institute's ("CEI") Jonathan Adler.[90] In his article, Exxon's Raymond argued:

> Proponents of the global warming theory say that higher levels of greenhouse gases — especially carbon dioxide — are causing world temperatures to rise and that burning fossil fuels is the reason . . . Yet scientific evidence remains inconclusive as to whether human activities affect global climate. . . .
>
> Taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand climate systems and develop the best long-term strategies.[91]

But nearly two decades earlier, Exxon's own scientists warned that "man has a time window of five to ten years (i.e. before 1987) before the need for hard decisions regarding changes in energy strategies might become critical."[92]

d. CEI's Adler also downplayed the impact and severity of climate change-related extreme weather events, asserting that: "Research at Stanford University's Hoover Institution suggests that a moderate warming would reduce mortality rates in the U.S., so a slightly warmer climate would be more healthful."[93] Scientists at the time did not expect fewer cold-weather deaths to offset the increased number of expected heat deaths.

e. In an October 1997 speech, Exxon's Lee Raymond described climate models—which Exxon had used to assess the impact of climate change on its business since

---

[89] Peter Langcake, Shell Internationale Petroleum Maatschappij B.V., *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects* 14 (1994), https://www.documentcloud.org/documents/4411099-Document11/.
[90] Exxon Corp., *Global Warming: Who's Right?* (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right/.
[91] *Id.* at 2–3.
[92] Letter from J.F. Black, Scientific Advisor, Exxon Res. & Eng'g Co., to F.G. Turpin, Vice President, Exxon Res. & Eng'g Co. on The Greenhouse Effect 2 (June 6, 1978), https://www.documentcloud.org/documents/2805568-1978-Exxon-Presentation-on-Greenhouse-Effect/.
[93] Exxon Corp., *Global Warming: Who's Right?* 6–7 (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 45

at least 1989, including decisions to modify arctic drilling infrastructure—as "notoriously inaccurate."[94] He argued that climate change was mainly caused by "natural" phenomena, despite overwhelming evidence and consensus that it was primarily caused by burning fossil fuels:

> We also have to keep in mind that most of the greenhouse effect comes from natural sources . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.[95]

Contradicting Exxon scientists' early knowledge that continuing to burn fossil fuels would "cause dramatic environmental effects before the year 2050,"[96] Raymond asserted: "It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now."[97]

   f. On November 6, 1997, Mobil published an advertisement in the *New York Times*, "Science: What We Know and Don't Know," claiming climate science was too uncertain to justify regulating emissions: "Within a decade, science is likely to provide more answers on what factors affect global warming, thereby improving our decision-making. We just don't have this information today."[98]

   g. In 1998, Exxon produced a booklet, "Global Climate Change: Everyone's Debate," intended to inform audiences about "the science, economics and other aspects of the issue" as well as "the many steps Exxon and others are taking — from research to reforestation."[99] The booklet falsely asserted, "Does the tiny portion of greenhouse gases

---

[94] Lee R. Raymond, Chairman & Chief Executive Officer, Exxon Corp., Remarks at World Petroleum Congress: Energy—Key to Growth and a Better Environment for Asia-Pacific Nations 10 (Oct. 13, 1997), https://www.documentcloud.org/documents/2840902-1997-Lee-Raymond-Speech-at-China-World-Petroleum/.
[95] *Id.* at 9.
[96] Steve Knisely, Exxon Research & Eng'g Co., *Controlling the CO₂ Concentration in the Atmosphere* 1 (1979), https://www.documentcloud.org/documents/2805569-1979-Exxon-Memo-on-Potential-Impact-of-Fossil/.
[97] Lee R. Raymond, Chairman & Chief Executive Officer, Exxon Corp., Remarks at World Petroleum Congress: Energy—Key to Growth and a Better Environment for Asia-Pacific Nations 11 (Oct. 13, 1997), https://www.documentcloud.org/documents/2840902-1997-Lee-Raymond-Speech-at-China-World-Petroleum/.
[98] Mobil, *Science: What We Know and Don't Know*, N. Y. TIMES (Nov. 6, 1997), https://www.documentcloud.org/documents/705547-mob-nyt-1997-11-6-whatweknow.
[99] Exxon, *Global Climate Change: Everyone's Debate* 3 (1998), https://www.documentcloud.org/documents/2805537-1998-Exxon-Global-Climate-Change-Everyones-Debate/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

caused by burning fossil fuels have a measurable effect on worldwide climate? No one knows for sure."

h.     In reality, by 1998, Exxon executives had known for over two decades that "scientific opinion overwhelmingly favor[ed] attributing atmospheric carbon dioxide increase to fossil fuel combustion" and that a doubling of atmospheric $CO_2$ above pre-Industrial levels "would produce a mean temperature increase of about 2°C to 3°C over most of the earth."[100]

i.     On March 23, 2000, ExxonMobil published an advertisement in the *New York Times*, entitled "Unsettled Science," alleging that a 1°F increase in global surface temperatures since the Industrial Revolution did not indicate the climate was changing due to human activities: "Some use this result to claim that humans are causing global warming, and they point to storms or floods to say that dangerous impacts are already underway. Yet scientists remain unable to confirm either contention."[101]

---

[100] Letter from J.F. Black, Scientific Advisor, Exxon Res. & Eng'g Co., to F.G. Turpin, Vice President, Exxon Res. & Eng'g Co. on The Greenhouse Effect 2, 8 (June 6, 1978), https://www.documentcloud.org/documents/2805568-1978-Exxon-Presentation-on-Greenhouse-Effect/.

[101] ExxonMobil, *Unsettled Science*, N. Y. TIMES (Mar. 23, 1980), https://www.documentcloud.org/documents/705605-xom-nyt-2000-3-23-unsettledscience/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

# Unsettled Science

Knowing that weather forecasts are reliable for a few days at best, we should recognize the enormous challenge facing scientists seeking to predict climate change and its impact over the next century. In spite of everyone's desire for clear answers, it is not surprising that fundamental gaps in knowledge leave scientists unable to make reliable predictions about future changes.

A recent report from the National Research Council (NRC) raises important issues, including these still-unanswered questions: (1) Has human activity already begun to change temperature and the climate, and (2) How significant will future change be?

The NRC report confirms that Earth's surface temperature has risen by about 1 degree Fahrenheit over the past 150 years. Some use this result to claim that humans are causing global warming, and they point to storms or floods to say that dangerous impacts are already under way. Yet scientists remain unable to confirm either contention.

Geological evidence indicates that climate and greenhouse gas levels experience significant natural variability for reasons having nothing to do with human activity. Historical records and current scientific evidence show that Europe and North America experienced a *medieval warm period* one thousand years ago, followed centuries later by a *little ice age*. The geological record shows even larger changes throughout Earth's history. Against this backdrop of large, poorly understood natural variability, it is impossible for scientists to attribute the recent small surface temperature increase to human causes.

Moreover, computer models relied upon by climate scientists predict that lower atmospheric temperatures will rise as fast or faster than temperatures at the surface. However, only within the last 20 years have reliable global measurements of temperatures in the lower atmosphere been available through the use of satellite technology. These measurements show little if any warming.

Even less is known about the potential positive or negative impacts of climate change. In fact, many academic studies and field experiments have demonstrated that increased levels of carbon dioxide can promote crop and forest growth.

So, while some argue that the science debate is settled and governments should focus only on near-term policies—that is empty rhetoric. Inevitably, future scientific research will help us understand how human actions and natural climate change may affect the world and will help determine what actions may be desirable to address the long-term.

Science has given us enough information to know that climate changes may pose long-term risks. Natural variability and human activity may lead to climate change that could be significant and perhaps both positive and negative. Consequently, people, companies and governments should take responsible actions now to address the issue.

One essential step is to encourage development of lower-emission technologies to meet our future needs for energy. We'll next look at the promise of technology and what is being done today.

**Sargasso Sea Temperature**

*Medieval warm period*

*Little ice age*

°F

1000  500  0  500  1000  1500  2000
BC  AD



**ExxonMobil**

*Figure 8* ExxonMobil *New York Times* advertorial promoting scientific uncertainty.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 48

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

j.      The advertisement cited a graph of temperature data in the Sargasso Sea from 1000 BC to 2000 AD, alleging that "[g]eological evidence indicates that climate and greenhouse gas levels experience significant natural variability for reasons having nothing to do with human activity." In response, the scientist who originally published the Sargasso Sea data wrote to ExxonMobil, accusing the company of "exploiting the data for political purposes," since "[t]here's really no way those results bear on the question of human-induced climate warming."[102]

k.      Exxon continued to publish misleading advertisements undermining climate science for several years, including in the *New York Times* in 2004, in which Exxon downplayed the relationship between climate change and extreme weather events:

> [T]he recent record cold weather in the Northeast U.S. does not indicate a cooling climate, just as last year's record summer heat in Europe does not confirm a warming world. [103]

The same advertisement falsely asserted that climate science was not advanced enough to determine whether human activities were altering the global climate or assess future impacts:

> [S]cientific uncertainties continue to limit our ability to make objective, quantitative determinations regarding the human role in recent climate change or the degree and consequences of future change.[104]

4.70.   The so-called "uncertain" science was the same body of science that, in the 1980s, accurately predicted both atmospheric $CO_2$ concentration and temperature levels for the year 2000. A quantitative analysis of ExxonMobil's climate communications between 1989 and 2004 found that, while 83% of the company's peer-reviewed papers and 80% of its internal documents acknowledged the reality and human origins of climate change, 81% of its advertorials communicated doubt about those conclusions.

---

[102] Letter from Lloyd D. Keigwin, Senior Scientist, Woods Hole Oceanographic Inst., to Peter Altman, National Coordinator, Campaign ExxonMobil 2 (Dec. 11, 2000), https://www.documentcloud.org/documents/3033801-2000-Letter-From-Woods-Hole-to-Exxon/.
[103] ExxonMobil, *Weather and Climate*, N. Y. TIMES (Jan. 21, 2004), https://www.documentcloud.org/documents/2080756-xom-2004-jan-21-weather-and-climate/.
[104] *Id.*

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 49

**Bechtold Law Firm, PLLC**
PO BOX 7051, MISSOULA, MT 59807
(406) 721-1435

4.71.    In a 2019 Congressional hearing, Dr. Martin Hoffert, a scientist who worked on Exxon's climate science research team beginning in 1981, testified that ExxonMobil's public statements on climate change were inconsistent with its internal knowledge:

> The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[105]

### 3.    Defendants funded seemingly independent scientists to create the false appearance of a scientific divide about the evidence of climate change.

4.72.    In addition to spreading climate change denial to the public directly and through industry trade associations and groups, Defendants commissioned proxies, including fringe scientists and conservative think tanks, to spread denial on their behalf. These groups include, but are not limited to, CEI, the Committee for a Constructive Tomorrow, the George C. Marshall Institute, Heartland Institute, and Frontiers for Freedom. Notable "skeptic" scientists with ties to the fossil fuel industry included individuals like Patrick J. Michaels, Richard S. Lindzen, Robert C. Balling, S. Fred Singer, Roy W. Spencer, John R. Christy, Judith Curry, Wei-Hock "Willie" Soon, and Sallie Baliunas.

4.73.    Between the early 1990s and mid-2000s, Defendants and their industry groups published numerous reports and advertisements undermining climate science, citing work from climate skeptics and contrarian think tanks, many of which Defendants directly funded. In March 2007, Phillip Cooney, an attorney at API from 1996 to 2001, testified at a Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized the role of fossil fuels in causing climate change.[106] From 1998 to 2014, ExxonMobil spent

---

[105] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform*, 116th Cong. 7–8 (2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, N.Y.U.), https://perma.cc/JRA9-P8L4.

[106] *Political Interference with Climate Science Before the H. Comm. on Oversight & Gov't Reform* 32 (2007) (deposition of Philip Cooney, Former Chief of Staff, White House Council on Environmental Quality), https://perma.cc/8EF9-VHDH.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 50

over \$30 million funding organizations misrepresenting the scientific consensus that fossil fuels were causing climate change with severe consequences for the public.

4.74.    In 2003, scientists Willie Soon and Sallie Baliunas published a paper, "Proxy Climatic and Environmental Changes of the Past 1000 Years," which argued that the twentieth century was not the warmest century of the past 1,000 years. The authors declared no conflict of interest in the article, although it was partially funded by API. Defendant-funded groups promoted Soon and Baliunas' 2003 paper without disclosing their involvement in its publication. In December 2003, former GCC president and API executive William O'Keefe published an op-ed in the *Seattle Post-Intelligencer*, "Global warming an uncertainty," in which he cited Soon and Balinuas' research, alleging that "the science of climate change is far from settled; there is no 'scientific consensus.'"[107]

4.75.    After receiving backlash from leading scientific institutions for funding some 39 organizations "that misrepresented the science of climate change,"[108] ExxonMobil announced in its 2007 Corporate Citizenship report that it would "discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in an environmentally responsible manner."[109]

4.76.    Despite its declaration, ExxonMobil failed to follow through in discontinuing this funding. For example, in 2008, Gene Tunison, an ExxonMobil manager of global regulatory affairs and research planning, said Exxon should direct a scientist to help API write a paper about climate science uncertainty: "I support [Exxon] co-authoring a paper on uncertainty in measuring GHGs."[110] And from 2008-2010, Exxon funded more of Soon's contrarian research.

---

[107] William O'Keefe, *Global Warming an Uncertainty,* SEATTLE POST INTELLIGENCER (Dec. 11, 2003), https://www.seattlepi.com/local/opinion/article/global-warming-an-uncertainty-1131949.php.
[108] Letter from Bob Ward, Senior Manager of Policy Commc'n, The Royal Soc'y, to Nick Thomas, Dir. of Corp. Affairs, Esso UK Ltd. (Sept. 4, 2006), https://www.documentcloud.org/documents/2805598-Letter-From-the-Royal-Society.
[109] ExxonMobil, *2007 Corporate Citizenship Report* 39 (Dec. 31, 2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.
[110] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, WALL STREET J. (Sept. 14, 2023), https://www.wsj.com/business/energy-oil/exxon-climate-change-documents-e2e9e6af.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO BOX 7051, MISSOULA, MT 59807
(406) 721-1435

**F.    When Defendants could no longer publicly dispute the existence of climate change, they began deceiving the public and consumers about the severity of climate change, as well as Defendants' role in and commitment to preventing further harm.**

4.77.    By the late 1990s and early 2000s, Defendants realized that their outright climate denial may expose them to liability. To preserve their economic empire, and while continuing to fund climate denial through a network of third-party validators, Defendants pivoted from the frontal attack on climate science in their own messaging to more sophisticated forms of deception. Defendants began to superficially claim to accept the science of climate change, while continuing to sow uncertainty about its causes and consequences. The thrust of this modern deception was to downplay the need for urgent action to reduce fossil fuel consumption while overplaying the industry's commitment to solutions.

4.78.    This shift in tactics, which continue to this day, capitalized on the growing misunderstanding and skepticism about climate change Defendants manufactured through their prior affirmative efforts to disavow the existence and dangers of climate change. Due to Defendants' efforts, many consumers remain confused about the relationship between fossil fuels and climate change and are vulnerable to Defendants' continued misinformation.

4.79.    The confusion Defendants have sown has deprived generations of consumers of the information necessary to make informed purchasing decisions, leading to an entrenchment of individual and societal fossil fuel reliance—and the resulting climate impacts. Defendants have also misled consumers into believing that climate change is not dangerous and that fossil fuel companies are adequately managing greenhouse gas emissions to avoid climate catastrophe. These misrepresentations further interfere with an ordinary consumer's ability to understand or appreciate the risks of using fossil fuel products, as well as with preparedness for climate disasters.

*1.    Defendants downplay the severity of climate change to mislead consumers into believing the problem is not urgent.*

4.80.    In 2001, the GCC formally disbanded. BP and Shell departed from the group in 1996 and 1998, respectively. Following their departure, the companies admitted the existence of anthropogenic climate change but continued to downplay its severity and the need for urgent action. BP America's Group Chief Executive John Browne, for instance, advocated against

1   urgent action to curtail fossil fuel use, arguing instead for a gradual, voluntary approach to

2   mitigating climate change. Shell likewise downplayed the well-established severity and called

3   for "precautionary" measures, insinuating that action taken now would be done in advance of

4   the onset of the problem, even though the company knew that the effects of climate change

5   were already accelerating.

6       4.81.   The rest of the industry followed suit, in conjunction with a $2 million

7   campaign laid out by API. The campaign sought to delay climate action—not through outright

8   denial as before, but rather by downplaying the risks of climate change and portraying the oil

    and gas industry's "positive contribution" as part of the solution.[111]

9       4.82.   In the early 2000s, Defendants began to acknowledge the risks of climate

10  change and claimed to support action. However, Defendants continued to downplay the need

11  for "major reductions in fossil fuel combustion" that they knew would be necessary to mitigate

12  the greenhouse effect[112] and instead followed API's strategy to "promote industry's positive

13  contribution to a long-term approach as an alternative to near-term targets and timetables."[113]

14           a.    In 2000, ExxonMobil stated: "We agree that the potential for climate

15  change caused by increases in carbon dioxide and other greenhouse gases may pose a

    legitimate long-term risk. However, we do not now have a sufficient scientific understanding

16  of climate change to make reasonable predictions and/or justify drastic measures."[114]

17           b.    In 2002, Shell similarly opined: "The emission of carbon dioxide ($CO_2$),

18  mainly from burning fossil fuels, and other greenhouse gases (GHGs) could be changing the

19  global climate. Long-term effects are not fully understood, but we share the widespread

20  concern."[115]

21
22  [111] *Political Interference with Science: Global Warming, Part II before H. Comm. on Oversight & Gov't Reform*, 110th Cong., Compilation of Exhibits, Exh. H (2007) (API, *Strategic Issue – Climate Change* 3), https://perma.cc/X83H-UYG4.

23  [112] Exxon Research & Engineering CO., *$CO_2$ "Greenhouse Effect": Summary* 2 (1982), https://www.documentcloud.org/documents/2805576-1982-Exxon-Memo-to-Management-About-CO2/.

24  [113] *Political Interference with Science: Global Warming, Part II before H. Comm. on Oversight & Gov't Reform*, 110th Cong., Compilation of Exhibits, Exh. H (2007) (API, *Strategic Issue – Climate Change* 3), https://perma.cc/X83H-UYG4.

25  [114] ExxonMobil, *Global Climate Change: A Better Path Forward* 1 (2000), https://www.documentcloud.org/documents/2805541-2000-Exxon-a-Better-Path-Forward/.

26  [115] Shell, *The Shell Report 2002: Meeting the Energy Challenge* 28 (2003), https://digital.hagley.org/Ebook_20220051_N2002.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 53

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

c.    In 2006, ExxonMobil published a report asserting "we recognize that the accumulation of greenhouse gases in the Earth's atmosphere poses risks that may prove significant for society and ecosystems" but which then disparaged the IPCC and argued that there was too much uncertainty in the science to conclude that human activities caused climate change:

> While assessments such as those of the IPCC have expressed growing confidence that recent warming can be attributed to increases in greenhouse gases, these conclusions rely on expert judgment rather than objective, reproducible statistical methods. Taken together, gaps in the scientific basis for theoretical climate models and the interplay of significant natural variability make it very difficult to determine objectively the extent to which recent climate change might be the result of human actions. These gaps also make it difficult to predict the timing, extent and consequences of future climate change.[116]

d.    That same year, the Royal Society's Senior Manager of Policy Communications, Bob Ward, wrote to Esso (ExxonMobil) to express "disappointment at the inaccurate and misleading view of the science of climate change" in ExxonMobil's public reports. In response to Exxon's disparagement of the IPCC quoted above, Ward wrote:

> [T]hese statements are very misleading. The 'expert judgement' of the [IPCC] was actually based on objective and quantitative analyses and methods, including advanced statistical appraisals, which carefully accounted for the interplay of natural variability, and which have been independently reproduced.
>
> Furthermore, these statements in your documents are not consistent with the scientific literature that has been published on this issue.[117]

4.83.    Over the same period, Defendants heeded API's call to "[e]mphasize industry's positive role and actions," particularly "[i]ndustry voluntary programs."[118] Defendants

---

[116] ExxonMobil, *Tomorrow's Energy: A Perspective on Energy Trends, Greenhouse Gas Emissions and Future Energy Options* 10 (2006), https://www.documentcloud.org/documents/25032808-xom-2006-tomorrows_energy/.

[117] Letter from Bob Ward, Senior Manager of Policy Commc'n, The Royal Soc'y, to Nick Thomas, Dir. of Corp. Affairs, Esso UK Ltd. (Sep. 4, 2006), https://perma.cc/5LU2-DNUE.

[118] *Political Interference with Science: Global Warming, Part II before H. Comm. on Oversight & Gov't Reform*, 110th Cong., Compilation of Exhibits, Exh. H (2007) (API, *Strategic Issue – Climate Change* 3), https://perma.cc/X83H-UYG4.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

shrewdly characterized their voluntary measures during this time as "precautionary," suggesting they were acting with care in advance of the problem.

        a.    In 2001, BP announced: "BP's GHG target is evidence of our concern for climate change and our support for precautionary action."[119]

        b.    In 2003, ChevronTexaco said: "One of the environmental concerns we all share is global climate change. We recognize that the use of fossil fuels has contributed to an increase in greenhouse gases – mainly carbon dioxide and methane – in the earth's atmosphere. . . . ChevronTexaco recognizes and shares the concerns that governments and the public have about climate change. We have developed a comprehensive program to manage greenhouse gas emissions, and it is being integrated into our business decisions."[120]

4.84.   These statements obscured what Defendants knew to be true: "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even stabilise the situation."[121]

**2.    *Defendants deceptively promote their performative efforts to purportedly mitigate climate change.***

4.85.   While understating the need for serious collective action on climate change, and in an effort to temper concerns about the risks of their products, Defendants misrepresented their own efforts to manage GHG emissions. Defendants have engaged—and continue to engage—in this deceptive conduct to dupe consumers into believing Defendants' voluntary actions are sufficient protection against the dangers posed by climate change. These tactics have proven remarkably effective.

*Overstating Ability to Manage Emissions Through Carbon Capture and Storage ("CCS")*

4.86.   In statements targeting the public, the companies have represented CCS as a technology that is feasible, scalable, and will be implemented in the near future to mitigate the threat of climate change. But Defendants are not on track to deploy CCS at a scale that would meaningfully reduce emissions. According to the International Energy Agency, CCS currently

---

[119] BP Amoco p.l.c., *Environmental and Social Review 2000* 5 (2001), https://perma.cc/GZ44-3NTZ.
[120] ChevronTexaco Corp., *2002 ChevronTexaco Corporate Responsibility Report* 38 (2003), https://perma.cc/FAF4-3Z7N.
[121] R.P.W.M. Jacobs et al., Greenhouse Effect Working Group, Shell Internationale Petroleum Maatschappij B.V., *The Greenhouse Effect* 1 (1988), https://www.documentcloud.org/documents/4411090-Document3/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

captures only 45 metric tons of $CO_2$ per year, equivalent to one-tenth of one percent (0.1%) of total annual energy sector emissions. Defendants' continued promotion of CCS technology as a realistic climate solution prolongs fossil fuel usage and misleads the public and consumers about how adequately GHG emissions from fossil fuels are being managed to avoid dangerous climate change.

      a.    In the mid-2000s, Shell ran full page ads in major news outlets promoting its CCS projects. One ad in the *Washington Post* featured an image of $CO_2$ being captured by a butterfly net, with the caption: "The world needs to tackle $CO_2$ emissions. Carbon capture and storage (CCS) technology aims to capture $CO_2$ and store it safely underground. . . . Perfecting CCS won't be easy, but we believe it is needed to tackle $CO_2$ emissions."[122] Chevron ran a similar butterfly net-CCS advertisement in 2020, claiming to have invested "over 1 billion dollars" in the technology over the previous decade.[123]

      b.    In August 2016, ExxonMobil published a promotional video on its YouTube channel (now unlisted), titled "Carbon Capture Technology," in which it claimed: "ExxonMobil is a leader in carbon capture. Our team is working to make this technology better, more affordable, so we can reduce emissions around the world. That's what we're working on right now."[124] But only a few months earlier, in its 2016 Outlook for Energy, ExxonMobil stated: "As nations look for ways to curb emissions, particularly from coal, some are considering capturing $CO_2$ and storing it underground; however, carbon-capture-and-storage technologies continue to face substantial economic and practical hurdles that will likely limit their deployment."[125]

    4.87.    While publicly representing that CCS could significantly reduce emissions, Defendants internally acknowledged that CCS could not be deployed at a scale that would meaningfully reduce emissions within the next several decades.

---

[122] *See* Joseph Romm, *Shell Greenwashes with a Full-Page WaPo Ad*, GRIST (Dec. 5, 2008), https://perma.cc/ZD7E-JE2D.
[123] Chevron, *TV Spot, 'Butterfly'* (July 24, 2020), *available at* https://www.ispot.tv/ad/nsNl/chevron-butterfly.
[124] ExxonMobil, *Carbon Capture Technology*, YOUTUBE (Aug. 5, 2016), https://www.youtube.com/watch?v=8Ij-HWslPwM.
[125] ExxonMobil, *The Outlook For Energy: A View to 2040* 41 (2016), https://www.connaissancedesenergies.org/sites/connaissancedesenergies.org/files/pdf-actualites/2016_outlook_for_energy_exxonmobil.pdf.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 56

a.     In the widely shared "Sky Scenario," an ambitious climate scenario outlined by Shell, the company estimated that 10,000 large carbon capture and storage facilities would need to be built by the year 2070 to keep global temperatures under 1.5°C.

b.     Acknowledging that this was extremely unlikely, a confidential 2018 ExxonMobil planning document projected that fewer than 500 CCS facilities would be operational by 2050: "CCS and hydrogen are deployed, but global scale is limited."[126]

4.88.   Despite internal skepticism, the advertisements continued. For instance, in March 2019, ExxonMobil launched another CCS television commercial, which compared CCS plants to actual plants: "Plants capture $CO_2$. What if other kinds of plants captured it too? If these industrial plants had technology that captured carbon like trees, we could help lower emissions." The advertisement also claimed: "Carbon capture is an important technology, and experts agree. That's why we're working on ways to improve it so plants can be a little more like plants."[127]

*Misrepresenting Commitment to Emissions Reductions and "Net-Zero" Ambitions*

4.89.   For the past 25 years, Defendants have falsely and misleadingly claimed they are working to reduce emissions and, more recently, achieve "net-zero"—meaning the amount of greenhouse gas emissions released into the atmosphere through the company's activities would be equal to the amount it removes from the atmosphere.

4.90.   In 2016, nations around the world signed onto the Paris Agreement, an international, voluntary agreement designed to limit anthropogenic warming below 1.5°C. Publicly, oil and gas companies, including Defendants, expressed their support, while they privately strategized how to avoid commitment to the Accords. For example:

a.     In March 2017, ExxonMobil Vice President Pete Trelenberg wrote in a letter to a Biden Administration official:

> ExxonMobil supports the Paris Agreement as an effective framework for addressing the risks of climate change. We

---

[126] ExxonMobil, *Scenario Comparison: Shell Sky & Energy Outlook Scenario D* 6, 11 (Apr. 2, 2018), https://perma.cc/TRJ8-NS5F.
[127] Exxon Mobil, *TV Spot: 'Carbon Capture'* (Mar. 18, 2019), *available at* https://www.ispot.tv/ad/IW6P/exxon-mobil-carbon-capture.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 57

welcomed the Paris Agreement when it was announced in December 2015, and again when it came into force in November 2016. We have reiterated our support on several occasions in opinion pieces and blog posts, most recently by our Chairman and CEO, Darren Woods.[128]

b.    In the referenced blog post, Woods stated that ExxonMobil was "encouraged that the pledges made at last year's Paris Accord create an effective framework for all countries to address rising emissions."[129] Woods also asserted that ExxonMobil's own planned carbon emissions reductions were "consistent with the results of the Paris accord commitments."

c.    But internally, ExxonMobil strategized to avoid advocating for the Paris Agreement. In suggested edits to a public statement on "responding to the climate challenge," Trelenberg suggested ExxonMobil "remove reference to Paris Agreement" because "[c]reating a tie between our advocacy/engagements and the Paris Agreement could create a potential commitment to advocate on the Paris Agreement goals."[130]

4.91.    On February 12, 2020, less than a month after holding a creative workshop to strategize how the company could "win back the trust" of influencers and younger generations,[131] BP announced its "new ambition to become a net zero company by 2050 or sooner."[132] The company also announced it would "stop corporate reputation advertising."[133] Influencers celebrated BP for being the first oil and gas company to announce a net-zero ambition.

---

[128] Letter from Peter W. Trelenberg, Manager, Envtl. Pol'y & Plan., Exxon Mobil Corp., to G. David Banks, Special Assistant to the President for Int'l Energy & Env't 1 (Mar. 22, 2017), https://perma.cc/D3X2-27HR.
[129] Darren Woods, *The future of energy – opportunities and challenges* (Feb. 23, 2017), https://web.archive.org/web/20170321042012/https://energyfactor.exxonmobil.com/perspectives/the-future-of-energy-opportunities-and-challenges/.
[130] Memo from Darren W. Woods, ExxonMobil, to Peter W. Trelenberg, ExxonMobil 4 (Aug. 20, 2019), https://perma.cc/2G5T-S3NK; *see also* Memo from Majority Staff, H. Comm. on Oversight & Reform, 117th Cong., to Members of the Committee on Oversight and Reform on Analysis of the Fossil Fuel Industry's Legislative Lobbying and Capital Expenditures Related to Climate Change (Oct. 28, 2021), https://perma.cc/XB8V-7AS3.
[131] *See* WPP, *BP Creative Workshop: Briefing Document* 38 (Jan. 14, 2020), https://www.documentcloud.org/documents/20073850-bp-creative-workshop-v3-no-film/.
[132] BP, *BP Sets Ambition for Net Zero By 2050, Fundamentally Changing Organization to Deliver* (Feb. 12, 2020), https://perma.cc/ZZ8R-SCFD.
[133] ClientEarth, *BP Pulls Advertising Campaign Just Months After Our Legal Complaint* (Feb. 14, 2020), https://perma.cc/4TJA-D5SQ.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 58

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1

2    4.92.    The company's net zero emissions-reductions plan, however, was far less

3    ambitious than suggested and excluded the company's joint venture with Russian oil giant

4    Rosneft, which accounted for roughly a third of BP's production. In total, nearly half (46%) of

5    BP's emissions were not covered by the company's net zero goal, including emissions from

6    all oil and gas BP purchased from other companies to refine and sell to customers. Then, in

     February 2023, the company walked back its pledge to cut fossil fuel output by 40%, reducing

7    its target to 25%. In October 2024, BP abandoned its target to cut oil and gas output by 2030

8    altogether, scaling back its energy transition strategy "to regain investor confidence."

9    4.93.    Several months after BP delivered its net-zero announcement, then-Shell CEO

10   Ben van Beurden announced Shell would also aim to be a net-zero energy business by 2050.

11   Shell's net-zero plan did not include reductions in fossil fuel output and, while Shell pledged

12   to decrease oil production by 1-2% per year through 2030, it planned to *increase* its gas

13   production by 4% per year over the same period. Instead, unbeknownst to Shell's customers,

14   the company's strategy relied on its customers purchasing large-scale offsets, for example,

15   large tracts of forested land. The company claimed it would reduce the net carbon intensity of

     its energy products by 20% by 2030 but anticipated that emissions would continue to increase

16   until then.

17   4.94.    ConocoPhillips claims its "actions for our oil and gas operations are aligned

18   with the aims of the Paris Agreement" and lauds its "Net-Zero Roadmap," described as a

19   "Paris-aligned climate risk strategy" and "a comprehensive framework with an ambition to

20   become a net-zero company for operational emissions by 2050."[134]

21

22

23

24

25

26

---

[134] ConocoPhillips, Quarterly Report (Form 10-Q) (Aug. 3, 2023); ConocoPhillips, *The Net-Zero Roadmap: Implementing our Ambition* (May 23, 2022), https://perma.cc/JGJ5-83HQ; ConocoPhillips, *Home Page*, https://perma.cc/AL4C-X4RS.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 59

*Figure 9* ConocoPhillips's website home page promoting its net-zero ambition.

Yet ConocoPhillips's focus on its "operational" emissions, which includes emissions from refineries, drilling, and other activity, ignores the much more significant greenhouse gas emissions from the intended and foreseeable use of its products.

4.95.  Functionally, Defendants have cut fossil fuels from their branding efforts but not their business operations. According to one analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low-carbon energy sources, Shell spent 1.2%, Chevron and Exxon just 0.2% each, and ConocoPhillips 0.0%.

4.96.  Rather than reducing emissions, Defendants are ramping up fossil fuel production like never before. Exxon is projected to increase oil production by more than 35% between 2018 and 2030—a sharper rise than over the previous 12 years. Shell is forecast to increase output by 38% by 2030, expecting to grow its crude oil production by more than half and its gas production by over a quarter. BP is projected to increase production of oil and gas by 20% by 2030. Chevron set an oil production record in 2018 of 2.93 million barrels per day. A 2019 investor report touted Chevron's "[s]ignificant reserve additions in 2018" in the multiple regions in North America and around the world.[135] ConocoPhillips' Willow Project in Alaska is expected to produce approximately 576 million barrels of oil, with associated indirect GHG emissions equivalent to 239 million tons of $CO_2$.

*Overemphasizing the Role of Individuals in Reducing Emissions*

4.97.  As established above, Defendants did not disclose the risks of using their fossil fuel products to consumers when changes in consumer behavior could have avoided the most serious impacts of climate change. Now that Defendants have built their fossil fuel empire and

---

[135] Chevron, *Chevron 2019: Investor Presentation* 26 (Feb. 2019), https://perma.cc/HR6B-BW3Z.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 60

no longer dispute that climate change is real, they suggest consumers can solve climate change by changing their individual behavior. Defendants know this solution will not work to prevent or safeguard against the dangers their products have created.

      a.    As part of its "Beyond Petroleum" campaign in the mid-2000s, BP pioneered the "carbon footprint calculator," a tool that encouraged individuals to calculate their contribution to climate change and reduce their emissions. The company ran ads with the copy: "Reduce your carbon footprint. But first, find out what it is."[136]

      b.    In 2008, Chevron launched its "I Will" campaign, which encouraged consumers to use less energy, and featured images of "real" people alongside headlines like: "I will use less energy"; "I will finally get a programmable thermostat"; and "I will leave the car at home."[137]

      c.    In August 2019, ExxonMobil ran an "Efficient Driving Tips" campaign on Facebook captioned, "It's tempting to crank the AC and windows while driving in warm weather, but here's how you can stay cool while enhancing your fuel economy." The video states, "While driving around town, roll the windows down and skip the AC to keep from draining your engine. But when headed to the highway, keep the windows up to reduce any drag."[138]

_Inflating Level of Investment in Renewable Energy_

4.98.    Defendants heavily promote their investments in renewable energy to give the false impression that their operations are climate friendly. Their commercial advertisements frequently include imagery of renewable energy, and, in some cases suggest a transition away from fossil fuels. In reality, Defendants' marketing budget for renewable energy has been disproportionate to their level of investment in renewable energy production, and fossil fuels continue to make up nearly all of Defendants' investment portfolios.[139] These

---

[136] _See_ Geoffrey Supran & Naomi Oreskes, _The Forgotten Oil Ads That Told Us Climate Change Was Nothing_, Guardian (Nov. 18, 2021), https://perma.cc/K53J-SSSY.

[137] Mark Robert Wills, _Chevron - Will You Join Us,_ https://perma.cc/DZ2J-SSYB.

[138] ExxonMobil, _Efficient Driving Tips_, Facebook (Aug. 27, 2019), https://www.facebook.com/ExxonMobil/videos/363914631187079.

[139] In 2022, for example, oil and gas companies allocated less than 2.5% of their capital expenditures to clean energy, accounting for only one percent of total clean energy investment globally.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 61

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1   misrepresentations falsely imply Defendants' business practices are aligned with action

2   necessary to avoid catastrophic climate change and act as a retention policy for their social

3   license to operate.

4           a.      In Shell's 1999 *Profits & Principles* campaign, the company advertised

5   its commitment to developing renewable energy, stating in one ad: "Ignoring alternative energy

6   is no alternative. Keeping pace with the world's accelerating demand for energy and supplying

7   power to remote areas require Shell to pursue renewable resources like solar, biomass and wind

8   energy. We established Shell Internationale Renewables with a US$500 million commitment

9   to develop these new opportunities commercially."[140] In 2006, six years after the campaign

    launched, Shell sold its solar assets.

10          b.      In 2000, BP launched its "Beyond Petroleum" campaign, a $200 million

11  effort to rebrand the company as eco-friendly and "get at" public skepticism around oil and

12  gas companies. As part of the campaign, the company shortened its name from British

13  Petroleum to BP, changed its corporate insignia from a shield to a green, white, and yellow

14  sunburst, and coined the slogan, "Beyond Petroleum." It also ran print, TV, and outdoor

15  advertisements touting BP as "the first oil company to publicly recognize the risks of global

16  climate change" and emphasizing the company's investments in renewable energy.[141]

17  According to the campaign lead, K. J. Bowen, BP ran "[h]undreds of ads [that] appeared in

    NY Times, WSJ, Washington Post and other publications in major cities."[142]

18

19

20

21

22

23

24

25  [140] Shell, *Listening and Responding: The Profits & Principles Advertising Campaign* 7 (1999),
    https://www.documentcloud.org/documents/4425677-Shell-Documents-Trove-2-10/.

26  [141] Darcy Frey, *How Green Is BP?*, N.Y. TIMES MAGAZINE (Dec. 8, 2002),
    https://www.nytimes.com/2002/12/08/magazine/how-green-is-bp.html.

    [142] K.J. Bowen, *BP*, https://perma.cc/Q3LS-M4ZM.

COMPLAINT FOR DAMAGES:                              **Bechtold Law Firm, PLLC**
WRONGFUL DEATH                                      PO Box 7051, Missoula, MT 59807
                                                    (406) 721-1435
PAGE 62




*Figure 10* Examples of BP's "Beyond Petroleum" campaign.

c.    A consumer survey found that the Beyond Petroleum campaign significantly enhanced public perceptions of BP as a "green" company. But BP's actual investment in clean energy was only a negligible percentage of its total capital expenditure during this period. The vast majority of BP's investments during this period were to increase fossil fuel exploration, production, refining, and marketing. A public relations professional who worked on the campaign later admitted that Beyond Petroleum was "just advertising" to portray BP as a company "trying to find newer, smarter, cleaner ways of powering the world," rather than a genuine commitment to change.[143] The company, the public relations professional said, "didn't go beyond petroleum. They are petroleum."

d.    After reaping the public relations benefits of "Beyond Petroleum," BP began to wind down its renewable energy assets. In 2009, the company shut down its alternative energy headquarters and sold its India-based windfarm operation. In 2011, the company closed its solar business and in 2013 attempted to sell off its US wind business, but failed to find a buyer. Since then, BP has followed a trend of buying into and then selling off renewable energy assets—in February 2025, the company scrapped their promoted target for renewable power generation.

---

[143] John Kenney, *Beyond Propaganda,* N.Y. TIMES (Aug. 14, 2006), https://www.nytimes.com/2006/08/14/opinion/14kenney.html.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 63

e.      Chevron ran advertisements in major newspapers and magazines touting its commitment to developing advanced biofuels. One 2007 *New Yorker* ad read: "We're partnering with major universities to develop the next generation of biofuels."[144] In October 2010, Chevron launched its "We Agree" campaign, featuring television and print advertisements trumpeting the company's commitment to renewable energy. One television advertisement from the campaign asserted: "At Chevron, we're investing millions in solar and biofuel technologies."[145] Another print advertisement, which ran with the headline "It's time oil companies get behind the development of renewable energy," stated: "Something's got to be done. So we're doing it. . . . We're not just behind renewables. We're tackling the challenge of making them affordable and reliable on a large scale."[146] In 2014, Chevron closed its renewable power business.



*Figure 11* Example of Chevron's "We Agree" campaign.

f.      ExxonMobil has also deceptively promoted its investments in renewables including through its "Unexpected Energy" campaign, launched in 2017. The campaign included a series of video and digital native advertisements in partnership with the *New York Times* promoting ExxonMobil's "advanced" biofuels. In one video advertisement,

---

[144] Geoffrey Supran & Naomi Oreskes, *The Forgotten Oil Ads That Told Us Climate Change Was Nothing*, GUARDIAN (Nov. 18, 2021), https://perma.cc/K53J-SSSY.

[145] PlusMinus, *Chevron We Agree - Oil Companies Should Support Renewable Energy*, VIMEO (Sep. 21, 2012), https://vimeo.com/49939390.

[146] Javier Vela, *Chevron We Agree Campaign* (2012), https://web.archive.org/web/20121023020935/http://www.javiervela.com/70932/527893/portfolio/chevron-we-agree-campaign.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 64

**Bechtold Law Firm, PLLC**
PO BOX 7051, MISSOULA, MT 59807
(406) 721-1435

the company claims: "Scientists at ExxonMobil are exploring how to use these scraps to create biofuel on a vast scale."[147]

4.99.    Defendants heavily promote unrealistic, unproven, or inconsequential "solutions" to climate change. Defendants' advertisements and other public statements often suggest that such solutions are currently or will soon become available. Defendants publicly advertise their commitment to these so-called solutions while simultaneously acknowledging internally that they (a) will not meaningfully reduce emissions, and/or (b) will not be commercially viable for many decades, if ever.

**G.    Defendants' misconduct delayed climate mitigation and adaptation measures that could have prevented Julie's death.**

*1.    Defendants' deceptive conduct materially interfered with the development of alternative energy technologies that could have replaced or significantly reduced fossil fuel use and dependence decades ago.*

4.100.    Opportunities to reduce the use of fossil fuels and associated greenhouse emissions, mitigate the harms associated with the use and consumption of fossil fuels, and promote development of alternative, clean energy sources have been available for decades. Defendants themselves developed some of these technologies, though they did not promote them. Despite this knowledge that alternative energies presented a viable alternative, Defendants chose to delay this urgent transition away from heavy reliance on fossil fuels by deceiving consumers and the public.

a.    In 1963, Esso (Exxon Mobil) obtained multiple patents on technologies for fuel cells, including on the design of a fuel cell and necessary electrodes, and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.

b.    In 1970, Esso (Exxon Mobil) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of fossil fuels used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).

---

[147] T Brand Studio, *From Farm Waste to Fuel Tank | Presented by ExxonMobil*, YouTube (Sept. 25, 2018), https://www.youtube.com/watch?v=UBiTdaBCkj4.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 65

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1

2

       c.      In 1973, Shell obtained a patent for a process to remove acidic gases, including $CO_2$, from gaseous mixtures.

3

4

5

       d.      Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams.

6

7

8

9

10

11

12

4.101.  Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued, could penetrate half of a competitive energy market in approximately 50 years. This internal estimate was based on extensive modeling within the academic community, including research from David Rose at the Massachusetts Institute of Technology, who concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Rose's conclusions, stating they were "based on reasonable assumptions."[148]

13

14

15

4.102.  Likewise, a 1987 Shell briefing on "Synthetic Fuels and Renewable Energy" noted that while "[i]mmediate prospects" were "limited," "[n]evertheless it is by pursuing commercial opportunities now and in the near future that the valuable experience needed for further development will be gained." The brief also noted:

16

17

18

19

20

21

22

23

> [T]he task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop clean, convenient alternatives. Initially these will supplement and eventually replace valuable oil products, especially as transport fuels. Many potential energy options are as yet unknown or at very early stages of research and development. New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century.[149]

24

25

26

---

[148] Exxon Research & Engineering CO., *CO$_2$ "Greenhouse Effect": Summary* 18 (1982), https://www.documentcloud.org/documents/2805576-1982-Exxon-Memo-to-Management-About-CO2/.
[149] Shell, *Synthetic Fuels and Renewable Energy*, Shell Briefing Service, no. 2, 1987, at 1, https://assets.documentcloud.org/documents/4411089/Document2.pdf.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 66

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

4.103. Defendants' deceptive acts prevented consumers and policymakers from making an informed choice about their own use and acquiescence to the proliferation of fossil fuels and fossil fuel-reliant infrastructure. Defendants' own actions to protect themselves from the impacts of climate change demonstrate that society would, at a minimum, have been better prepared for events like the 2021 Heat Dome if Defendants had not misled consumers about the risks of their fossil fuel products.

**2.** ***The public could have started preparing for climate change when Julie was still a teenager had Defendants disclosed the same climate research and data they used to inform their own business decisions.***

4.104. By the mid-1970s, Defendants had known for almost 20 years that burning fossil fuels would lead to "marked changes in climate,"[150] including "noticeable increases in temperature" significant enough to melt sea ice in the Arctic Ocean.[151] Defendants used their sophisticated understanding of climate modeling to advance and protect their own interests.

a.    As early as 1973, Exxon obtained a patent for a cargo ship capable of breaking through sea ice and an oil tanker designed specifically for use in previously unreachable areas of the Arctic.

b.    The next year, in 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses, allowing for drilling in areas with increased ice flow movement due to elevated temperature.

c.    The same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions, allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

d.    Shell obtained a patent similar to Texaco's (Chevron) in 1984.

4.105. By at least the late 1980s, Defendants used internal climate modeling to assess the impact of climate change and plan for the future.

---

[150] Frank N. Ikard, *Meeting the Challenges of 1966*, *in* Proceedings of the American Petroleum Institute 13 (1965), https://www.documentcloud.org/documents/5348130-1965-API-Proceedings/.
[151] E. Robinson & R.C. Robbins, Stanford Res. Inst., *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants* (1968), https://www.documentcloud.org/documents/24223162-1968-stanford-research-institute-sources-abundance-and-fate-of-gaseous-atmospheric-pollutants-prepared-for-american-petroleum-institute/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

PAGE 67

a.      In October 1989, researchers at the University of Victoria produced a report for Esso (ExxonMobil Canadian subsidiary), using a form of climate models called General Circulation Models (GCMs) to assess possible climate impacts in the Mackenzie River Valley and Delta region in Northern Canada, with "specific concern for those impacts that would affect energy operations."[152] The authors concluded that fossil fuel-induced climate change would cause significant impacts to the region, noting that "[d]espite the difficulties still faced by the GCM models, the fact that most of the model scenarios are in agreement that the Arctic will likely experience a warmer climate with higher precipitation amounts cannot be ignored."[153]

b.      In 1992, Esso researcher and engineer Ken R. Croasdale used two GCMs to produce a draft report assessing potential climate change-induced impacts on offshore petroleum operations in the Beaufort Sea. Croasdale concluded that climate change would have some negative impacts on oil and gas operations in the Arctic, but that as a result of increased temperatures and reduced sea ice, "[i]t would appear that potential global warming can only help lower [petroleum] exploration and development costs."[154]

4.106.  ExxonMobil frequently disparaged climate models to the public, describing them as unreliable and "notoriously inaccurate" in publications, advertisements, and speeches throughout the 1990s and early 2000s. At the same time, Defendants incorporated those very same projections into their business planning, expending millions of dollars to insulate infrastructure against future global warming-induced impacts.

a.      In 1988, a confidential Shell planning report acknowledged that climate change impacts might pose a threat to oil and gas operations, but that governments could cover the costs of industry's damages: "Direct operational consequences can be expected from a rising sea level, impacting offshore installations, coastal facilities and operations (e.g. platforms, harbours, refineries, depots) with an uncertain magnitude. Costs of defending

---

[152] Stephen Lonergan & Kathy Young, *An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic*, 7 Energy Exploration & Exploitation 359, 359 (1989), https://doi.org/10.1177/014459878900700508.
[153] *Id.* at 362.
[154] K.R. Croasdale, *Climate Change Impacts on Northern Offshore Petroleum Operations* 13 (1992), https://www.documentcloud.org/documents/21039783-ken-croasdale-esso-resources-presentation-at-1992-canada-us-symposium-climate-change-impacts-on-northern-offshore-petroleum-operations/.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

against a sea level rise will depend on the local situation (levels of security demanded for contingencies like extreme ocean storms, flooding, etc.) and national policies to compensate industry for the extra costs incurred."[155]

b.    A year later, in 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for an offshore drilling platform that was anticipated to operate until roughly 2065. In response to projected sea level rise, Shell engineers planned to elevate the natural gas platform, located in the Troll gas field in the North Sea, 31 or 32 meters higher above sea level than was initially planned, at a cost of $16 million per meter gained.

c.    In 1991, Esso's Croasdale told audiences at an engineering conference: "Certainly any major development with a life span of say 30-40 years will need to assess the impacts of potential global warming. . . . This is particularly true of Arctic and offshore projects in Canada, where warming will clearly affect sea ice, icebergs, permafrost and sea levels."[156]

d.    In the mid-1990s, ExxonMobil, Shell, and Imperial Oil (ExxonMobil) jointly undertook an offshore drilling project in Nova Scotia. In 1996, the Environmental Impact Statement for the project acknowledged a "global warming sea-level rise" of 0.5 m [1.64 feet] "may be assumed during the [25-year] project life."[157] Exxon and Shell designed their coastal and offshore structures accordingly.

4.107.  Defendants' internal actions were aligned with their knowledge about climate change and how it would impact the earth's systems. Had they disclosed the same information to the public and consumers, climate alterations that were foreseeable to Defendants would have also been foreseeable to the public and consumers. With this knowledge, climate adaptation measures to protect vulnerable people like Julie from climate disasters could have been implemented in a similar vein as Defendants' infrastructure-fortification measures.

4.108.  Due to Defendants' failure to provide an adequate warning and affirmative deception about the risks of their fossil fuel products, lifesaving climate adaptation measures

---

[155] R.P.W.M. Jacobs et al., Greenhouse Effect Working Group, Shell Internationale Petroleum Maatschappij B.V., *The Greenhouse Effect* 27 (1988), https://www.documentcloud.org/documents/4411090-Document3/.
[156] Sara Jerving et al., *What Exxon knew about the Earth's melting Arctic,* L.A. Times (Oct. 9, 2015), https://perma.cc/LL8N-7RD7.
[157] 3 *Environmental Impact Statement*, *in* Sable Offshore Energy Project: Development Plan Application, 4-76, 4-77 (1997).

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 69

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

are reactive rather than proactive. For instance, in the aftermath of the Heat Dome, the Pacific Northwest has rallied together to support those most vulnerable to extreme heat by implementing education campaigns, warning systems, and cooling programs to prevent deaths like Julie's. These types of lifesaving measures, and others, are examples of how the public could have prepared had they been given adequate warnings of the dangers associated with the use of defendants' products.

**H.    Defendants' wrongful conduct is the proximate cause of Julie's Death.**

4.109.   Defendants' actions and omissions in concealing the dangers of, promoting false and misleading information about, and engaging in massive campaigns to promote the increased use of fossil fuels have succeeded in misleading consumers and the public in Washington, including in King County, and elsewhere about the climate impacts of using fossil fuels. Their conduct, including their failure to warn, deprived the public, including Julie, of the information necessary to mitigate climate change decades ago and continues to deprive consumers of the information necessary to assess the risks posed by their use of fossil fuel products.

4.110.  Defendants' deceptive and tortious conduct has prevented widespread understanding of the urgency and severity of climate change, and interfered with and delayed the development and implementation of public and personal precautionary measures that could have saved Julie's life.

4.111.  Defendants' deceptive and tortious conduct has obstructed and delayed the introduction and adoption of alternative, low-carbon technologies, deepened consumers' dependence on fossil fuels, driven increased use of oil and gas, and contributed substantially to the buildup of carbon dioxide in the atmosphere that causes global warming and the resulting impacts (including public health impacts) of climate change.

4.112.  Defendants' deceptive and tortious conduct as described in this Complaint is the proximate cause of climate change and its devastating impacts, including the extreme heat that killed Juliana Leon in Seattle during the Heat Dome.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

## V.  LEGAL CLAIMS

### COUNT ONE – WRONGFUL DEATH AND SURVIVAL, CH. RCW 4.20

5.1.    Plaintiff incorporates all the above paragraphs here.

5.2.    Under RCW 4.20.010, "[w]hen the death of a person is caused by the wrongful act, neglect, or default of another person, his or her personal representative may maintain an action against the person causing the death for the economic and noneconomic damages sustained by the beneficiaries listed in RCW 4.20.020 as a result of the decedent's death . . . ."

5.3.    Further, under RCW 4.20.020, an "action under RCW 4.20.010 shall be for the benefit of the spouse, state registered domestic partner, child or children . . . of the person whose death shall have been so caused."

5.4.    Defendants engaged in wrongful acts actionable under RCW 4.20 including, but not limited to, the Counts alleged herein and any other conduct deemed wrongful or unlawful.

5.5.    Defendants' wrongful conduct as outlined in this Complaint directly and proximately caused personal injury and the wrongful death of Decedent Juliana Leon, causing significant economic and non-economic damages, the extent of which will be proven at trial, to Decedent and her family, including her daughter, Plaintiff Misti Leon.

### COUNT TWO – WASHINGTON PRODUCT LIABILITY ACT, FAILURE TO WARN, CH. RCW 7.72

5.6.    Plaintiff incorporates all the above paragraphs here.

5.7.    Under the Washington Product Liability Act, a defendant manufacturer is liable for failure to warn at the time of manufacture if: (1) the manufacturer's product was not reasonably safe at the time of manufacture because the manufacturer failed to adequately warn of that product's risks; and (2) the failure to adequately warn caused harm. RCW 7.72.030(1)(b).

5.8.    A manufacturer is liable for failing to warn after manufacture when it learns of or should have learned of a danger connected with its product after it was manufactured and

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 71

does not provide warnings as a reasonably prudent manufacturer would do under the circumstances. *Id.* 7.72.030(1)(c).

5.9.    A product seller other than a manufacturer (including wholesalers, distributors, and retailers) is liable for harm caused by its negligence, including negligent failure to warn, and for misrepresentations and intentional concealment of information about the product. *Id.* 7.72.040(1)(a) and (c).

5.10.    Defendants are manufacturers and/or sellers other than manufacturers of dangerous fossil fuel products. These products have never been safe because their intended use or foreseeable misuse creates a risk of catastrophic harm to the climate and humankind.

5.11.    Although Defendants have known of this risk and how to mitigate it for decades, they have never issued product warnings to consumers. Instead, Defendants have affirmatively concealed the risks by deceiving the public about the reality of climate change, the consequences of climate change, and the role their fossil fuel products play in causing and exacerbating climate change.

5.12.    Given the magnitude of these risks, and particularly in light of Defendants' affirmative campaigns to deceive the public, Defendants' fossil fuel products were unsafe to an extent beyond that which would be contemplated by ordinary consumers.

5.13.    At the time of manufacture, the likelihood and foreseeability that Defendants' fossil-fuel products would cause catastrophic harm—including death from extreme weather events—rendered and renders Defendants' failure to warn unreasonable. Defendants' accompanying campaigns to sow misinformation and doubt about the about the existence of climate change, severity of climate change, causes of climate change, and solutions to climate change further support Defendants' culpability and made warnings necessary.

5.14.    Post-manufacture, Defendants acquired increasingly detailed and sophisticated knowledge of the catastrophic effects of unabated fossil fuel use, including the increased likelihood and severity of extreme weather events, the increased costs to human health, and the increased likelihood of death. As a result, Defendants had a duty to warn consumers of the causal connection between the use of their fossil fuel products and these risks.

5.15.    Defendants breached their duty to warn both at the time of manufacture and post-manufacture by failing to warn or inform users of the climate-disruptive effects of fossil

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

fuel combustion. This breach is exacerbated by Defendants' deceptive actions, including but not limited to, attacking climate science and promoting themselves and their fossil fuel products as environmentally friendly and sustainable.

5.16.    Further, those Defendants acting primarily as wholesalers, distributors, and/or retailers of fossil fuel products at all relevant times knew those products would cause catastrophic harm, yet negligently failed to warn of those harms, and misrepresented and/or intentionally concealed material facts about unabated use of those products.

5.17.    Defendants' failures to warn, misrepresentations, and intentional concealments are a proximate cause of heightened fossil fuel consumption, which has directly caused elevated greenhouse gas emissions and, in turn, the Heat Dome and the extreme and unprecedented temperatures that killed Juliana Leon. As a proximate result of Defendants' acts and omissions, Decedent Juliana Leon suffered fatal injuries and sustained damages in an amount to be determined at the time of trial. Juliana Leon's death is the direct and foreseeable result of Defendants' tortious conduct.

5.18.    As a further direct and proximate result of Defendants' conduct, from the time of Decedent's injuries until her death, Juliana Leon suffered intense physical pain and suffering, anxiety, emotional distress, and/or humiliation, all to her damage, the full extent of which will be established at the time of trial.

## COUNT THREE – PUBLIC NUISANCE, CH. RCW 7.48

5.19.    Plaintiff incorporates all the above paragraphs here.

5.20.    Under RCW 7.48.120, "[n]uisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property."

5.21.    An actionable nuisance subject to damages and other relief includes "whatever is injurious to health or indecent or offensive to the senses . . . so as to essentially interfere with the comfortable enjoyment of the life and property." *Id.* 7.48.010. "A public nuisance is one

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 73

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." *Id.* 7.48.130.

5.22.    Pursuant to RCW 7.48.210, "[a] private person may maintain a civil action for public nuisance" where "it is specially injurious to himself or herself."

5.23.    Defendants individually and in concert with each other, have engaged, and continue to engage in, unlawful, negligent, reckless, knowing, and/or intentional tortious conduct. Such conduct includes at a minimum:

a.    promoting and creating doubt in the public's mind about the existence, causes, and effects of climate change;

b.    promoting and creating the sale and use of fossil fuels without warning consumers that using fossil fuels would cause dangerous climate change;

c.    promoting and creating the sale and use of fossil fuels that Defendants knew to be hazardous and knew would cause or exacerbate climate change and related consequences, including, but not limited to, extreme heat events and the conditions that led to the Heat Dome, such as drought, soil aridity, and warm ocean temperature;

d.    concealing the hazards that Defendants knew would result from the normal use of their fossil fuels by misrepresenting, and casting doubt on, the integrity of scientific information related to climate change;

e.    promoting fossil fuels for uses and at levels that Defendants knew would be hazardous to consumers and the public;

f.    disseminating and funding the dissemination of information that misleads consumers and the public regarding the known and foreseeable risks of climate change and its consequences, which follow from the normal, intended use of fossil fuels;

g.    misleadingly promoting fossil fuel products as sustainable, clean energy products;

h.    misleadingly presenting themselves as clean energy companies who are committed to reducing emissions; and

i.    misleadingly promoting their investments in alternative technologies as capable of reducing emissions on a large-scale in the near-term.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 74

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

5.24.    Defendants' tortious conduct has caused harms to public health and property, as well as to Julie's health, safety and welfare so as to substantially interfere with her comfort, health, safety, and security in life. Defendants' campaign of deception has been pervasive and long-lasting. Their willful and deceitful campaign has influenced the public's purchasing and investment decisions for decades, driving increased demand for fossil fuels. It has also reduced demand for and investment in clean energy, thereby delaying the clean energy transition. Deception-induced increased demand for fossil fuels and decreased demand for clean energy directly led to increased greenhouse gas emissions, rendering deception a cause of Julie's death and the resulting injuries to the Estate.

5.25.    As a direct and proximate result of Defendants' conduct, Julie suffered fatal injuries and sustained damages in an amount to be determined at the time of trial. Defendants knew that continued fossil fuel consumption would lead to a climate crisis and spur deadly events like the 2021 Heat Dome. They nonetheless chose to engage in a sophisticated deception campaign that had the purpose and effect of sustaining, and inflating, fossil fuel consumption. Defendants' deception campaign furthermore limited understanding of the causes and consequences of climate change and stilted adaptations measures that could have saved lives. Julie's death is the direct and foreseeable result of Defendants' tortious conduct.

5.26.    As a further direct and proximate result of Defendants' conduct, from the time of Decedent's injuries until her death, Julie suffered intense physical pain and suffering, anxiety, emotional distress, and/or humiliation, all to her damage, the full extent of which will be established at the time of trial.

5.27.    Defendants' ongoing interference with public rights is substantial and unreasonable. The harm to Plaintiff is severe, and there is no social utility in deceiving and misleading the public.

5.28.    Defendants' tortious and deceptive conduct described in this Complaint is therefore a proximate cause of an unreasonable and substantial interference with common rights held by the public. The public nuisance and the harms that flowed from it were specially injurious to Plaintiff.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 75

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

1

2

## VI.    DAMAGES

6.1.    Plaintiff incorporates herein by reference all allegations and statements contained in the foregoing paragraphs.

6.2.    As a direct and proximate result of the aforesaid misconduct of Defendants, Decedent Juliana Leon suffered economic and non-economic damages in amounts to be proven at the time of trial. These damages include but are not limited to the pain, suffering, anxiety, emotional distress, humiliation, and fear Juliana Leon experienced immediately prior to her death.

6.3.    Plaintiff is entitled to all compensatory damages authorized under the law, including but not limited to:

a.    Damages for the decedent's medical expenses; lost earning capacity; lost future earnings; interference with normal life; and past and future economic damages;

b.    Damages for the decedent's injuries, mental anguish and emotional distress, and physical pain and suffering before her death;

c.    Damages for the loss of all statutory beneficiaries of decedent's services and support, protection, advice, counsel, guidance, and love and companionship, in such amount as, under all the circumstances of the case, may be just;

d.    Funeral and burial expenses;

e.    For costs and disbursements;

f.    For statutory attorney fees;

g.    For special and general damages in amounts to be proven at trial;

h.    For prejudgment interest on special damages; and

i.    For prejudgment interest on liquidated damages.

6.4.    Plaintiff seeks all other rights and remedies available under the law.

6.5.    All of the above damages are in an amount that will be proven at trial.

6.6.    Defendants are jointly and severally liable for all damages because injuries suffered are indivisible.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 76

**Bechtold Law Firm, PLLC**
PO Box 7051, Missoula, MT 59807
(406) 721-1435

## VII.    PRAYER FOR RELIEF

Plaintiff prays for judgment and relief against Defendants, individually, jointly, and severally, as follows:

7.1.    For a judgment of liability and decree that Defendants have engaged in the wrongful conduct complained of herein;

7.2.    For an award for all economic and non-economic damages in amounts to be proven at trial;

7.3.    For an award of general and special damages in amounts to be proven at trial;

7.4.    For equitable relief, including, but not limited to, a public education campaign to rectify Defendants' decades of misinformation. Plaintiffs do **not** seek to enjoin, restrict, or regulate any fossil fuel activities (including the production, refining, or sale of fossil fuels) or greenhouse gas emissions by Defendants, or to enjoin, restrain, or interfere with Defendants' ability to lobby or petition any government, or to engage in non-deceptive speech about climate change;

7.5.    For exemplary or punitive damages against Defendants, under the applicable law of foreign jurisdiction(s);

7.6.    For pre-judgment and post-judgment interest as provided by law;

7.7.    For reasonable costs and attorneys' fees as provided by law; and

7.8.    For such other and further relief as this Court deems just and equitable.

Plaintiff reserves the right to pursue additional causes of action other than those specifically outlined above based on the facts pleaded herein or that emerge during discovery.

## VIII.   REQUEST FOR JURY TRIAL

8.1.    Plaintiff respectfully requests that all issues presented in this Complaint be tried by a jury, with the exception of any issues that, by law, must be tried before the Court.

COMPLAINT FOR DAMAGES:
WRONGFUL DEATH

PAGE 77

1
2

Dated on this 28th day of May, 2025.

3                                          Respectfully submitted,

4                                          */s/ Timothy Bechtold*
                                           TIMOTHY BECHTOLD, WSBA NO. 63495
5                                          Bechtold Law Firm, PLLC
                                           PO Box 7051, Missoula, MT 59807
6                                          Tel:    (406) 721-1435
                                           Email: tim@bechtoldlaw.net
7
8                                          ALIZABETH BRONSDON, WSBA NO. 63393
                                           Bronsdon Law Firm, PLLC
9                                          PO Box 7262, Missoula, MT 59807
                                           Tel:    (267) 664-3422
10                                         Email: bronsdonlaw@gmail.com

11                                         *Attorneys for Plaintiff, MISTI LEON, as personal
12                                         representative of the ESTATE OF JULIANA LEON*

13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DAMAGES:                          **Bechtold Law Firm, PLLC**
WRONGFUL DEATH                                  PO Box 7051, Missoula, MT 59807
                                                (406) 721-1435
PAGE 78